[No. B167543. Second Dist., Div. Six. Nov. 18, 2004.]

THE PEOPLE, Plaintiff and Appellant, v.
BRIDGET MARIE CALLAHAN, Defendant and Respondent.

## Counsel

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Robert M. Snider, and Michael A. Katz, Deputy Attorneys General, for Plaintiff and Appellant.

Kay Duffy, under appointment by the Court of Appeal, for Defendant and Respondent.

**OPINION**

**PERREN, J.**—Recently, the California Supreme Court held that "when a trial court, after examining all the relevant circumstances, grants a new trial in a criminal case on grounds that proven misconduct was prejudicial, that determination is not subject to independent or de novo review on appeal, but may be affirmed unless it constituted an abuse of discretion." (*People v. Ault* (2004) 33 Cal.4th 1250, 1255 [17 Cal.Rptr.3d 302, 95 P.3d 523] (*Ault*).) Although *Ault* concerned the grant of a new trial based on juror misconduct, we conclude that the principle of deference to orders granting a new trial applies with equal force to the granting of a new trial on the ground of ineffective assistance of counsel, as we previously held in *People v. Andrade* (2000) 79 Cal.App.4th 651, 659–662 [94 Cal.Rptr.2d 314] (*Andrade*). We further conclude that not only is the trial court's determination of prejudice in granting a new trial motion subject to the abuse of discretion standard of review, but also that the court's determination whether counsel's representation was deficient is subject to the same standard of review and not to independent review, as urged by the People. This result is consistent with the recognition that trial courts are uniquely qualified to evaluate the performance of trial counsel. Deference to the trial court's decision to grant a new trial is also necessary to vindicate the judge's duty to ensure that all trials are " 'conducted with solicitude for the essential rights of the accused.' [Citations.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 582 [189 Cal.Rptr. 855, 659 P.2d 1144].)

After a jury convicted Bridget Marie Callahan of the first degree murder of Nichole Hendrix (Pen. Code, § 187, subd. (a)), the trial court granted her motion for a new trial on the ground that her trial attorney had provided constitutionally ineffective assistance of counsel. Specifically, the court found that trial counsel was ineffective for (1) failing to sufficiently impeach the testimony of the two witnesses who supported the prosecution's theory that Callahan drugged the victim; (2) failing to call Callahan to testify for that purpose; and (3) failing to offer expert testimony to support a duress defense. Because we conclude that the trial court's determinations of error and prejudice are both reviewed for an abuse of discretion, and that the court did not abuse its discretion in making those findings here, we affirm the court's order granting a new trial.

## FACTS AND PROCEDURAL HISTORY

### I.

### *The Trial and Conviction*[1]

On the afternoon of October 15, 1998, 17-year-old Nichole Hendrix, her boyfriend Russell Nething, Stacey Warnock, and Jasmine Guinn were arrested at the La Quinta Inn in Ventura. Warnock telephoned Callahan from jail and told her they had been arrested because Hendrix had "ratted" on them. Callahan subsequently asked David Ziesmer and Michael Bridgeford to assist her in obtaining money for Warnock's bail. Ziesmer and Bridgeford were both members of the Skin Head Dogs (SHD), a male White supremacist gang.

Shortly thereafter, Hendrix telephoned Callahan and asked if she would assist her in making Nething's bail. Hendrix, Ziesmer, and Bridgeford subsequently met Callahan at her house. After Hendrix arrived, she ingested two pills from a prescription bottle on Callahan's dresser. Callahan later told the police that Nichole took the pills to alleviate the withdrawal symptoms of other drugs she had taken. Callahan also told the police she had warned Hendrix that the pills were strong, and that she would probably pass out if she took them.

Nicole Echols testified that she, Ziesmer, Bridgeford, and Jennifer Pinger had driven together to Callahan's house that day, and that she and Pinger had visited her cousin across the street while Ziesmer and Bridgeford were in Callahan's house. When Ziesmer and Bridgeford returned, Bridgeford joined Echols and Pinger in the passenger compartment, while Ziesmer sat in the truck bed. According to Echols, Callahan approached the open window on the passenger side of the truck and said, "I gave her the pills; she should be out in a couple hours." On cross-examination, Echols admitted that Bridgeford had been her boyfriend and that she had visited him and Ziesmer in jail and

---

[1] In late 1999, former Senior Deputy District Attorney Ron Bamieh, District Attorney Investigator Mark Volpei, and Officer Bill Gentry of the Ventura County Sheriff's Department extensively interviewed Callahan regarding her involvement in this case. Selective portions of the taped interview, which accounted for the majority of evidence offered against Callahan at trial, were played to the jury over her objection. Prior to trial, Callahan unsuccessfully moved to suppress the interview on the ground that the district attorney made representations prior to the interview that had led her to believe she would be immune from prosecution. As a result of that dispute, the Attorney General took over prosecution of the case. The propriety of the procedures employed by the district attorney, the Attorney General's decision to prosecute Callahan, and the trial court's decision to allow her statements to be used against her, are not before us in this appeal.

prison on several occasions. By the time of trial, however, she had disassociated herself from both of them.

Pinger essentially corroborated Echols's version of the events, except she recalled that Callahan had been at the *driver's* side window when she made the comment about Hendrix. She also recalled that the passenger side window was up. She also testified that Ziesmer had slapped Callahan on the back of the head and told her, "Don't be talking like that in front of my sister." On cross-examination, Pinger admitted that she had written and visited Ziesmer in jail and in prison, and that Ziesmer referred to her as his "little sister." She also conceded that the district attorney had promised to secure her services under the witness protection program in exchange for her testimony.

In her pretrial interview, Callahan recounted that she and Hendrix proceeded to Nething's father's house, where they picked up stolen electronic equipment that they intended to sell for bail money. The two subsequently met up again with Ziesmer and Bridgeford, and the four drove together in Nething's truck to the City Center Motel in Ventura. By the time they arrived at the motel, Hendrix was asleep. Callahan told Ziesmer and Bridgeford that Hendrix had agreed to sell the stolen equipment in order to obtain bail money for both Nething and Warnock. After Callahan rented a room in her own name, several individuals stopped by and purchased the equipment. While Ziesmer and Bridgeford were outside, Hendrix awoke and asked Callahan how she had gotten there. Callahan explained what had happened and told Hendrix to go back to sleep because ". . . I knew they weren't gonna give her the money for Russell's bail, they were gonna use it on Stacy's bail . . . ." With Callahan's permission, Hendrix called her mother on the telephone.

While Hendrix was on the telephone, Ziesmer and Bridgeford returned to the room. Ziesmer "started flippin' out" because he feared that Hendrix was going to report them to the police for stealing the electronic equipment. Callahan and Bridgeford told Ziesmer he should allow Hendrix to leave if she wanted, but Ziesmer refused. Instead, he took Hendrix to the bathroom and ordered Bridgeford to accompany him. Shortly thereafter, Ziesmer and Bridgeford came out of the bathroom and Ziesmer said, "we have to kill her or she's gonna tell on us . . . ."

Callahan and Bridgeford continued to argue with Ziesmer to let Hendrix leave. Ziesmer refused, and ordered Callahan to join Hendrix in the bathroom so that Hendrix "wouldn't leave" through the window. As Hendrix sat in the bathtub, Callahan hugged her and kissed her on the forehead. Callahan told Hendrix, "there was nothing I could do, you know there was no way I could stop what was gonna happen." When Callahan left the bathroom, she

told Ziesmer she had been "talking shit" to Hendrix because ". . . I was afraid if I told him what I did tell her, that something was gonna happen to me too, that I wasn't cooperating."

Callahan told the police she "knew that there was no way in hell" that Ziesmer was going to let Hendrix go. Ziesmer and Bridgeford went into the bathroom for what "seemed liked forever," while Callahan rocked in a chair and stared at a crack in the window. Ziesmer eventually emerged from the bathroom with a knife in his hand, and Bridgeford came out with a flashlight. Callahan went into the bathroom and found Hendrix dead in the bathtub with a slashed throat. Ziesmer returned to the bathroom with duct tape, which he used to stop Hendrix's body from bleeding. He then wrapped Hendrix's body in bed sheets, and he and Bridgeford carried the body to Nething's truck.

Ziesmer told Callahan to drive because neither he nor Bridgeford knew how to use a stick shift. After Ziesmer asked Callahan where they should "ditch" the body, she drove to the mountains near Santa Barbara. Ziesmer did not want to leave the body there, so they went to an associate's house in Santa Barbara, where they obtained a tarp to cover the body and the remaining stolen equipment.

The following day, Callahan, Ziesmer and Bridgeford went to "J.R.'s" house in Oxnard, where they stayed for two days and used drugs. During that period, Ziesmer and Bridgeford sold some of the remaining stolen equipment. The three of them also went to the Home Depot and bought cement, a trash can, and a chain saw. Ziesmer and Bridgeford placed Hendrix's body in the trash can with the cement, and left it outside J.R.'s house.

Callahan spent the following day or two in Ventura with Ziesmer and Bridgeford. During that period, Ziesmer and Bridgeford were arrested for assault. A couple of days later, another SHD member, J.D. Bowman, called Callahan to convey Ziesmer's demand that the two of them go to J.R.'s house and get rid of the body. Callahan, Bowman, and another individual, Roy Ashlock, retrieved the trash can containing Hendrix's body and dumped it in the mountains near the Pine Mountain sign in northern Ventura County. Hendrix's remains were discovered six months later.

Jessica Riessen and Jasmine Guinn both testified in Callahan's defense that SHD members were very controlling of the women who associated with them. Riessen also recounted an incident in which Ziesmer had grabbed Callahan by the throat. She also claimed that Ziesmer had put a "hit" on Callahan while he was in jail.

Dr. Katherine Emerick, a psychologist, testified that Callahan had a severe methamphetamine addiction at the time of the murder that would have

prevented her from "think[ing] her way out of a wet paper bag." Emerick further opined that Callahan had suffered from dissociation, which had caused her to "more or less stick her head in the sand" in stressful situations.[2]

At the conclusion of the trial, the jury was instructed on the prosecution's proffered theories of felony murder (CALJIC Nos. 8.21 (mod.), 9.40), aiding and abetting the robbery, kidnapping, and murder (CALJIC Nos. 3.00, 3.01), and robbery-murder and kidnapping-murder special-circumstance allegations (CALJIC No. 8.81.17). Callahan's request for a duress instruction (CALJIC No. 4.40) was refused. During deliberations, the jury requested a readback of Pinger's and Echols's testimony. The jury subsequently convicted Callahan of first degree murder, and found true the special circumstances allegations (§ 190.2, subd. (a)(17)(A), (B)). The jury also found true the allegation that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

After Callahan's trial attorney filed a motion for new trial, the trial court granted her motion to substitute new counsel for the purpose of filing another new trial motion. On March 4, 2003, substitute counsel filed a motion for new trial claiming that her trial attorney, Joseph O'Neill, provided ineffective assistance of counsel. The motion claimed, among other things, that counsel was ineffective for: (1) failing to sufficiently impeach Pinger's and Echols's testimony; (2) failing to call Callahan to testify on her own behalf; and (3) failing to offer expert testimony to support a duress defense to the underlying robbery and kidnapping.

## II.

### *The Motion for New Trial*

### A.

### *District Attorney Investigator Mark Volpei*

Volpei testified in support of Callahan's claim that her trial attorney provided ineffective assistance of counsel by failing to adequately cross-examine Pinger and Echols. According to Volpei, Pinger and Echols did not become involved in the case until he received a telephone call from Ziesmer's girlfriend, Kellie Rangel, near the conclusion of the grand jury

---

[2] Emerick described dissociation as "the capacity of someone to ignore what's going on around them and . . . take themselves to another place."

proceedings. Volpei thought that Rangel's call "seemed a little orchestrated." Later, as he was interviewing Echols in person, she received a telephone call from Pinger. Volpei overheard the conversation and thought it was "cryptic." The circumstances surrounding Pinger's and Echols's disclosures led Volpei to wonder whether he was being "duped." Volpei also noted Pinger had stated during a taped interview that Ziesmer had prompted her to come forward. Pinger also told Volpei she believed that if Ziesmer went "down" for Hendrix's murder, then Callahan should too. Volpei also testified he felt guilty about Callahan's conviction because he had told her "she could trust law enforcement and at the end she had handcuffs slapped on her. . . . I never had the chance to sit and tell her . . . what just transpired was completely taken out of my hands."

## B.

### *Bridget Callahan*

Callahan testified on her own behalf at the hearing. According to Callahan, she wanted to testify at her trial, but O'Neill advised her against it. Had she testified, she would have disputed Pinger's and Echols's testimony because she had not met either of them until after Hendrix was slain. She also claimed that Warnock would have supported her claim that she did not meet Pinger until several days after the murder.

Callahan also testified extensively regarding her recollection of the events leading up to and following Hendrix's murder. That testimony was substantially more detailed than the statements from her police interview that were admitted at trial. For example, she testified that she, Ziesmer and Bridgeford had injected methamphetamine while they were at the City Center Motel, and that she weighed only 82 pounds as a result of her chronic drug use. She also testified that Ziesmer had physically prevented her and Hendrix from leaving the motel room, and that she believed she would be killed if she did not comply with Ziesmer's orders. She also claimed that she had gone into the bathroom to talk to Hendrix, and that, contrary to her police statement, she had merely assumed that Ziesmer wanted to prevent Hendrix from leaving. She also testified extensively regarding the subordinate role of women who are involved with SHD members, and the physical and psychological abuse they face. For example, she stated that SHD members treated their women as "property," and that they were expected to be passive and sexually available.

## C.

### *Failure to Present Sufficient Evidence Supporting a Duress Defense*

Emerick, another psychologist, and a criminal defense attorney all testified to their opinions that O'Neill failed to sufficiently explore psychological evidence indicating that Callahan had acted under duress to the extent she participated in the robbery and kidnapping of Hendrix.[3] Emerick also testified that O'Neill had prevented her from interviewing Callahan after an incident during the preliminary hearing when she became physically ill during graphic testimony concerning Hendrix's death, notwithstanding Emerick's representation that she believed it might lead to evidence that would support her defense.

## D.

### *Joseph O'Neill*

O'Neill was called by the prosecution. When asked what Callahan could have lost by testifying, O'Neill responded that "any evidence that could be used against her would portray [her] in the worst, absolute worst possible light if we were to put her on the stand . . . ." He also denied that he had prevented Emerick from thoroughly interviewing Callahan, or that he had otherwise failed to sufficiently explore a psychological defense establishing that Callahan acted under duress.

## III.

### *The Trial Court's Ruling*

After considering all of the testimony and declarations offered in support of and in opposition to Callahan's motion, the trial court granted her a new trial. The court concluded, "this is the rare case where advice not to testify falls below the *Strickland*[4] standard. [¶] Trial counsel should have known before the trial and certainly knew by the end of the prosecution case that the People's primary theory of liability was felony murder, and that the underlying felonies, robbery and kidnapping, would support both first degree murder and the special circumstances which elevate the penalty to life without parole.

---

[3] As the trial court correctly ruled prior to trial, duress is a viable defense to the underlying felony of a felony murder. (*People v. Anderson* (2002) 28 Cal.4th 767, 784 [122 Cal.Rptr.2d 587, 50 P.3d 368].)

[4] *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052].

Counsel also knew at the time of the pretrial hearings that in California a duress defense will not excuse a murder, but does apply to underlying felonies in a felony murder scenario. He argued strenuously that Dr. Emerick's testimony was relevant to the latter issue. [¶] In other words, once the jury was convinced the defendant freely became a major participant in a robbery or kidnapping which culminated in the murder of Nichole Hendrix, she would almost certainly be spending the rest of her life in prison regardless of her mental state and level of participation in the killing itself. It follows that a competent defense required refuting the Pinger/Echols testimony that the defendant tacitly admitted drugging the victim involuntarily and conspiring with the codefendants to convert the property in the victim's possession to their own uses. The court recalls that the testimony of Pinger and Echols was the only testimony the jury requested be read back during deliberations. A competent defense required making every effort to portray any robbery and kidnapping as beginning inside the motel room, so that a duress jury instruction would be given, and counsel would have had a factual and legal basis to argue against application of the felony murder rule. [¶] As it was, the Pinger/Echols testimony went unrebutted, because it was unknown and not addressed during the pretrial statements of the defendant which were in evidence. The defense's own expert witness testified there was no duress at work before the arrival at the motel room. Consequently, there were no facts to support a duress instruction, and there was no way for counsel to convincingly argue against the felony murder theory, and no logical way for the jury to consider a duress defense. These difficulties were compounded by counsel's failure to impeach Pinger and Echols as fully as he could have. As evidenced by counsel's closing argument to the jury, he was left with very little of substance that he could say."

Regarding counsel's failure to call Callahan to testify, the court concluded, "the defense had no reasonable course other than to call the defendant, and . . . it was clear the benefits of that course would clearly outweigh the liabilities. Further, the entirety of defendant's [pretrial] statement was not admitted, since the People only offered excerpts, and the defense relied on questioning of a police detective to bring out portions of defendant's statement favorable to the defense." In concluding that Callahan suffered prejudice as a result of O'Neill's deficient performance, the court reasoned that "as things stood when the case went to the jury, there was virtually no chance of any result other than first degree murder, absent a sympathy verdict. Had the defendant testified, counsel would have had facts and a jury instruction on which to base a logical argument for a verdict more favorable than first degree murder with special circumstances. The defendant's testimony, more vivid and focused than the piecemeal presentation of her 1999 statements, presumably backed up by one or more forms of expert testimony, would potentially have made an impression on the jury sufficient to change

the outcome of the trial." In orally pronouncing its ruling, the court further stated, "It's been an extremely difficult decision for the court. I don't lightly overturn a jury verdict or put the victim's family through yet another trial in these proceedings. It may seem to some that the system has failed in this case up to this point, but I look at it in a different way. [¶] I think a retrial sooner rather than later is the lesser of two evils, and I don't wish to have someone sentenced to life without parole with a substantial cloud of doubt over the case. To me that would be a failure of the system and would result in years of further litigation and uncertainty for all concerned."

## DISCUSSION

### I.

#### *Standard of Review*

This is an appeal from an order granting a new trial on the ground of ineffective assistance of counsel. Although ineffective assistance of counsel is not among the grounds enumerated for ordering a new trial under Penal Code section 1181, motions alleging ineffective assistance are permitted pursuant to "the constitutional duty of trial courts to ensure that defendants be accorded due process of law." (*People v. Fosselman, supra,* 33 Cal.3d at p. 582.) We review such orders for an abuse of discretion. (*Andrade, supra,* 79 Cal.App.4th at pp. 659–662.) While the People correctly note we must independently review trial court determinations whether a defendant was prejudiced by juror misconduct in the context of a new trial motion that is *denied* (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87]), our Supreme Court recently clarified that orders *granting* a new trial on a finding of prejudicial juror misconduct are reviewed for an abuse of discretion (*Ault, supra,* 33 Cal.4th at p. 1265). Although the court in *Ault* did not expressly extend this rule to all orders granting a new trial, we discern no reason, and the People offer none, why the same standard of review should not apply to other findings of prejudice that are adjudicated in granting a new trial. (See *In re Resendiz* (2001) 25 Cal.4th 230, 248–249 [105 Cal.Rptr.2d 431, 19 P.3d 1171] [recognizing that the determination of error and prejudice on an ineffective assistance claim are predominantly legal mixed questions of law and fact].) As the court in *Ault* recognized, "the long-established rule of deference to trial court orders granting new trials recognizes that those courts are best positioned to determine whether errors or irregularities in proceedings before them were prejudicial. Moreover, when prejudicial errors or irregularities have occurred, the trial court's statutory power to order a new trial before a final judgment is entered promotes judicial efficiency by obviating the need for an appellate reversal or collateral attack." (*Ault, supra,* at p. 1271.)

Although the People effectively concede that the abuse of discretion standard of review applies to the trial court's finding that Callahan was *prejudiced* by her trial counsel's deficient performance, they find hope in the Supreme Court's declination to decide whether the same standard applies to the trial court's finding of *error* that involves a mixed law and fact issue. (*Ault, supra,* 33 Cal.4th at p. 1267, fn. 9.) The court refrained from addressing that issue in *Ault* because the parties conceded that jury misconduct had occurred. Here, by contrast, the People contest the trial court's finding that trial counsel erred by, among other things, failing to call Callahan to testify. Buoyed by *Ault*'s reservation of decision on this issue, the People urge us to apply an independent standard of review to the trial court's determination of error, while applying an abuse of discretion standard of review to its determination of prejudice.

Neither *Nesler* nor *Ault* compel such a result. On the contrary, part of the rationale underlying the court's decision in *Ault* applies with at least the same force where we are called upon to decide whether a trial judge erred in finding that any attorney's representation of a criminal defendant was deficient. As the court recognized in *Ault,* "trial courts have a strong incentive not to crowd their dockets and squander limited judicial resources by ordering unnecessarily that cases over which they presided, and which have already been taken to verdict, be retried. We are confident that motions for such relief are examined with considerable care." (*Ault, supra,* 33 Cal.4th at p. 1271, fn. omitted.) In support of that statement, the court in *Ault* quoted *Andrade* in recognizing that " '[a] trial court serves as a "gatekeeper" on a motion for new trial. It opens the gate only rarely, a testament to the fact that the vast majority of trials resulting in conviction are fairly conducted. In these cases, motions for new trial are routinely made, routinely denied, and are routinely affirmed on appeal.' " (*Id.,* at p. 1271, fn. 14, quoting *Andrade, supra,* 79 Cal.App.4th at p. 661.)

■ *Ault*'s holding that the standard of review for an order granting a new trial is premised on a truth which goes to the heart of appellate review: "A trial court's finding of prejudice is based, to a significant extent, on ' "first-hand observations made in open court," ' which that court itself is best positioned to interpret. [Citations.]" (*Ault, supra,* 33 Cal.4th at p. 1267.) Moreover, " 'the trial court is [also] in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney.' [Citation.]" (*Andrade, supra,* 79 Cal.App.4th at p. 660.) That truism is particularly apt in this case. Here, the trial judge, having observed Callahan testify at the hearing on the motion for new trial, detailed why he concluded that her attorney had no legitimate tactical reason for failing to call her to testify. The court also had the opportunity to observe the testimony of Pinger and Echols, and concluded that counsel erred in failing to sufficiently impeach them. No matter how

carefully we examine the record, no matter how thoughtful our reflections, we cannot evaluate the credibility of any witness to the same degree and with the same insight as the trial judge. In this respect, the trial court's finding of deficient performance was not qualitatively different from its finding of prejudice. In determining whether counsel's performance was deficient, we must accept all factual and credibility findings that are supported by substantial evidence. (*People v. Mayfield* (1997) 14 Cal.4th 668, 796 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Although the trial court's determination of deficient performance is a mixed question of fact and law (see *In re Resendiz, supra,* 25 Cal.4th at pp. 248–249), we defer to that determination where, as here, it is "predominantly factual or credibility based. [Citations.]" (*Ault, supra,* at p. 1265, fn. 8.)

The cases recognizing the trial court's unique ability to evaluate an attorney's performance are legion. (See, e.g., *People v. Fosselman, supra,* 33 Cal.3d at p. 582 ["It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them"]; *Andrade, supra,* 79 Cal.App.4th at p. 660 [" 'the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney' "]; *People v. Wallin* (1981) 124 Cal.App.3d 479, 483 [177 Cal.Rptr. 303] ["The trial judge is the one best situated to determine the competency of defendant's trial counsel. Where, as here, defendant is represented by different counsel at the motion for a new trial and the issue is called to the trial court's attention, the trial judge's decision is especially entitled to great weight and we defer to his fact finding power"]; *People v. Aubrey* (1999) 70 Cal.App.4th 1088, 1104 [83 Cal.Rptr.2d 209], disapproved on other grounds in *People v. Rubalcava* (2000) 23 Cal.4th 322, 334, fn. 8 [96 Cal.Rptr.2d 735, 1 P.3d 52].) Were we to second-guess the trial court's findings in this regard, we would emasculate the constitutional protections conferred in the exercise of the trial court's duty to ensure that all criminal trials are " 'conducted with solicitude for the essential rights of the accused.' [Citations.]" (*Fosselman, supra,* at p. 582.)

■ Accordingly, we reject an interpretation of *Nesler* or *Ault* that would require us to deviate from the rule that the trial court's decision to grant a new trial on the ground of ineffective assistance of counsel must be affirmed on appeal absent a clear abuse of discretion. (*Andrade, supra,* 79 Cal.App.4th at pp. 659–662.) A party seeking to overturn a court's decision in this regard "has the burden to demonstrate that the trial court's decision was 'irrational or arbitrary,' or that it was not ' "grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citation.]' [Citations.]" (*Id.,* at p. 659.) This burden is a heavy one: " 'Where the motion is made on a proper . . . ground, and the record contains some

showing in support of it, the judge's discretion in granting is almost invariably upheld; i.e., the appellate court gives the order all of the presumptions in favor of any appealable judgment.' " (*Ibid.*, quoting 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Appeal, § 3084, p. 3806.)[5] As we will explain, the People fail to meet that burden here.

## II.

### *Ineffective Assistance of Counsel*

■ "A new trial may be granted where the trial court finds that the defendant received ineffective assistance of counsel. [Citations.] To prevail on this ground, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*Andrade, supra*, 79 Cal.App.4th at pp. 659–660.)

■ Because we are reviewing trial counsel's conduct in hindsight, we hesitate to "second-guess" his tactical decisions. But, "[w]e are equally, if not more reluctant, to second-guess the trial court's discretionary ruling that defense counsel's tactical decisions made before it resulted in an unfair trial, i.e., a miscarriage of justice." (*Andrade, supra*, 79 Cal.App.4th at p. 660.) This is because, as we have already noted, " 'the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney.' [Citation.]" (*Ibid.*)

■ "The primary purpose of the requirement that counsel render effective assistance is, 'to ensure a fair trial . . . .' [Citation.] Thus, '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*Andrade, supra*, 79 Cal.App.4th at p. 660.)

The People's attack on the trial court's order is essentially threefold. First, they contend the court erred as a matter of law in concluding that Callahan's attorney could have succeeded in offering admissible evidence that she was suffering from battered women's syndrome at the time of the murder, and that such evidence would have been admissible to prove she was acting under duress to the extent she participated in the kidnapping and robbery of the

---

[5] See also *Andrade, supra*, 79 Cal.App.4th at page 654, footnote 1, and cases cited therein.

victim.[6] Second, they claim that Callahan's pretrial "confession" to robbery was sufficient to support her conviction even in the absence of Pinger's and Echols's testimony, and that in any event trial counsel's cross-examination of those witnesses was sufficient. Third, the People contend the court abused its discretion in finding that trial counsel's advice to Callahan to refrain from testifying was not a reasonable tactical decision. None of these contentions is persuasive.

Notwithstanding the People's lengthy discussion in its briefs regarding the application of battered women's syndrome to this case, the trial court's order is not premised on trial counsel's purported failure to develop and offer evidence indicating that Callahan was a battered woman. Although the syndrome was discussed by the experts who testified at the hearing on the new trial motion, in granting a new trial the court merely posited that if Callahan had testified regarding her fear of being killed if she did not comply with Ziesmer's orders, counsel may have succeeded in bolstering that testimony with an expert who could have opined that Callahan's fear was reasonable under the circumstances. Had this evidence been presented, Callahan would have been entitled to a duress instruction on the underlying felonies. "If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony." (See *People v. Anderson, supra,* 28 Cal.4th at p. 784.)

Regarding the People's claim that Callahan "confessed" to robbery, only a strained interpretation of the record would support such a conclusion. Callahan merely told the police in her pretrial interview that she was "sure" the robbery "[was her] fault." As she explained in her testimony at the new trial hearing, she only meant that she felt guilty for allowing Ziesmer and Bridgeford to become involved in the effort to sell the stolen equipment. Even without Callahan's explanation, no reasonable juror would have construed her remark as a confession to robbery.

We also reject the People's attack on the finding that trial counsel failed to sufficiently impeach Pinger and Echols. Their testimony was the only evidence offered to prove that Callahan had intentionally drugged the victim. Although counsel succeeded in establishing that Pinger and Echols were involved with Ziesmer and Bridgeford, the jury never heard about the

---

[6] Evidence Code section 1107 provides in pertinent part: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (See also *People v. Brown* (2004) 33 Cal.4th 892, 904–908 [94 P.3d 574].)

suspicious circumstances under which these witnesses came forward. More-over, Callahan not only disputed Pinger's and Echols's version of the events, but also denied she had met either of them prior to the murder. As the trial court noted, Pinger's and Echols's testimony was the only evidence the jury requested be read back. Because their testimony was so damning and was pivotal to the felony-murder theories upon which Callahan was convicted, the trial court did not abuse its discretion in faulting counsel for failing to sufficiently impeach that testimony, or in concluding that counsel's failure to do so undermined confidence in the verdict.

Finally, the People's contention that counsel was not ineffective for failing to call Callahan to testify is premised in large part on a factual assertion that is not supported by the record. According to the People, Callahan's testimony would not have made a difference in the outcome of the trial because she "bragged" during her pretrial statement that she had committed perjury in another case. A review of the portion of the record the People cite in support of this allegation reflects that Callahan merely said she had moved out of California after Assistant District Attorney Ron Bamieh had threatened to charge her with committing perjury in the grand jury proceedings of another SHD member.

The remainder of the People's attack on Callahan's testimony ignores the proper standard of review in this case. As we have already noted, the trial court found that Callahan's testimony at the new trial motion hearing was "more vivid and focused than the piecemeal presentation" of her pretrial statement to the police. The court also had the opportunity to view Callahan's demeanor on the stand, and concluded that her testimony would have placed her in a better light than what was conveyed on the tapes that were played to the jury. Although the People correctly note that the court did not expressly find that Callahan "[made] a good appearance on the stand" as the trial court did in *Andrade, supra*, 79 Cal.App.4th at page 658, such a conclusion is implicit in the court's ruling.

■ An appeal from an order granting a new trial in a criminal case is warranted only under limited circumstances, for example, when the trial court's ruling is premised on an erroneous interpretation of a statutory scheme. (*Andrade, supra*, 79 Cal.App.4th at p. 655, fn. 3.) Here, the trial judge determined that justice had not been served based on his observations throughout the proceedings. In granting a new trial, the court stated, "I don't wish to have someone sentenced to life without parole with a substantial cloud of doubt over the case. To me that would be a failure of the system and would result in years of further litigation and uncertainty for all concerned." Based on the record before us, it cannot be said that the trial court abused its discretion in ordering a new trial under the circumstances.

## CONCLUSION

Callahan's trial attorney prevented her from telling the jury why she acted as she did. As the trial court noted, without that evidence she effectively had no defense to the charged crimes. Absent a credible explanation of her conduct, an explanation that only she could offer, Callahan's concededly peripheral involvement in Hendrix's death allowed her to be drawn into a felony-murder conviction by the current of the felony-murder rule. The trial judge concluded that this missing link was sufficient to undermine confidence in the verdict, such that a new trial was necessary to prevent a miscarriage of justice. As the court in *Ault* noted, "the consequence of a deferential affirmance is only that the party who opposed the new trial motion will have to retry the matter *under correct rules of law*." (*Ault, supra*, 33 Cal.4th at p. 1267, fn. 9.) Our deference to the trial court's order merely ensures that the jury deciding Callahan's fate will hear the entirety of the matter, as it should have in the first trial.

The order granting Callahan's motion for a new trial is affirmed.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied December 16, 2004, and the opinion was modified to read as printed above.