Filed 7/10/14  P. v. Thomas CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RONALD D. THOMAS,<br><br>    Defendant and Appellant. | A137389<br><br>(Alameda County<br>Super. Ct. No. 164261) |

Appellant Ronald D. Thomas was tried before a jury and convicted of second degree murder with special allegations based on his use of a firearm.  (Pen. Code, §§ 187, 12022.5, subd. (a), 12022.53, subds. (b), (c) & (d).)[1]  He contends the judgment must be reversed because his trial attorney provided ineffective assistance of counsel in several respects.  He also argues the trial court erred in giving CALCRIM No. 371, regarding consciousness of guilt based on efforts to discourage testimony, and suggests the cumulative effect of the trial errors in this case require reversal even if they were not individually prejudicial.  We affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Alvin Burns was fatally shot on the night of November 20, 2009.  The Alameda County District Attorney filed an information charging appellant with murder (§ 187) and alleging he had personally and intentionally discharged a firearm and caused great bodily

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

injury and death (§ 12022.53, subd. (d)), had personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and had personally used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)). At his jury trial, appellant was tied to the shooting primarily through the testimony of two eyewitnesses, Z.T. and P.L.[2]

Sixteen-year-old Z.T. and her teenage cousin P.L. met appellant, known as "D," in the fall of 2009. P.L. was being choked by a man on 88th Street in Oakland and appellant came to her rescue. He was carrying a small silver gun. The girls went to appellant's house that night and Z.T. saw him a few times after that. Appellant and Z.T. spoke on the phone "probably every other day."

On the night of November 20, 2009, about a month after meeting appellant, Z.T. and P.L. were celebrating the birthday of Alvin Burns. After going to a McDonald's restaurant and dropping another friend at his home, Burns and the girls decided to meet Tielee P, who lived at 88th Street and MacArthur Boulevard near the Youth Uprising center. At the time, Tielee was Z.T.'s boyfriend and P.L.'s "best friend." Burns was driving his Honda sedan, with P.L. riding in the front passenger seat, and Z.T. in the back passenger seat.

Burns parked the car near Tielee's apartment building with the engine still running. It was dark outside but there was light from a streetlight. After about 10 minutes, Z.T. noticed appellant walking by and said something about seeing "D." P.L. recognized appellant and called out to him. Appellant approached the passenger side of the car to see who was inside, leaned in to the open back passenger window, and said "What's up?" in a confrontational manner. Burns looked at appellant "like he didn't know him." Appellant was wearing gold grills on his teeth and a diamond earring in his left ear.

The car began to roll and appellant accused Burns of trying to run over his foot. Appellant pulled a gun from his hip and shot Burns in the back of the head. As far as Z.T. knew, appellant and Burns did not know each other.

---

[2] P.L. was declared unavailable as a witness and her preliminary hearing testimony was read to the jury. (Evid. Code, § 1291.)

2

The car came to a stop against the curb across the street, in front of the Youth Uprising building. Burns was slumped in the seat. Blood was everywhere. P.L. unsuccessfully attempted to pull Burns's foot from the gas pedal but was unable to do so, so she pulled the key from the ignition. Tielee approached the car and told P.L. to keep talking to Burns to see if he could hear her. Tielee told her appellant was the shooter and had been taking drugs and was drinking.

Police were dispatched to the scene of the shooting. Burns was taken to the hospital, where he later died of a gunshot wound to the head. An expended bullet was found on the floor of the car in front of the driver's seat and a spent .40-caliber casing was found in a gutter across the street, indicating the weapon used was a semiautomatic. No weapons were found in Burns's car.

Z.T. and P.L. gave written statements at the scene, but they did not say they knew the shooter. They were placed in different patrol cars and taken to the police station for questioning, where they were separately interviewed. Z.T. seemed antagonistic and scared and did not want anyone to know she was at the police station. P.L. seemed upset and withdrawn. Z.T. held back at first because she was scared, but eventually she told police it was appellant who had shot Burns. P.L. was afraid of retaliation if she identified the shooter, and did not give appellant's name at first. She eventually admitted she knew the shooter and identified appellant. Both girls selected appellant's picture from a photographic lineup.

A few days after the shooting, officers approached appellant to arrest him as he was leaving a movie theater. Appellant ran down a ravine behind the theater, but was taken into custody after he tripped and fell. He was wearing a diamond earring in his left ear and officers found a set of gold grills and a cell phone in his pants pocket. A second cell phone, later associated with appellant, was found about 30 to 45 feet away. Police searched the home of appellant's girlfriend, who was with him at the time of his arrest, and found a birth certificate, Social Security card, and an identification card for the Youth Uprising center, all in appellant's name.

3

Cell phone records showed that calls were made from appellant's and Z.T.'s phones near the time of the murder that utilized the same cell phone tower, suggesting the phones were in the same area, though other calls made from Z.T.'s phone during that time frame utilized a different, nearby tower. The records also showed calls were made from appellant's cell phone to Z.T.'s cell phone that same night after the shooting in which the caller from appellant's phone blocked the number. Calls were made from Z.T.'s phone to appellant's phone between 4:25 a.m. and 6:11 a.m. on November 22, 2009.

P.L. told police she received a threatening call a couple of days after the shooting from a woman with a high-pitched voice who said, "Bitch, you are going to die." The voice sounded similar to one of the bystanders who helped them at the scene after the shooting. P.L. was 100 percent positive appellant was the shooter. She did not talk to Tielee after the shooting.

Z.T did not receive any threats, though appellant and other people called her. She had not answered her cell phone because she did not want to talk about what had happened. She liked appellant as a friend and thought both he and Burns were nice people. Z.T. had not spoken to Tielee since the shooting. She had no doubt appellant was the shooter.

After giving an opening statement suggesting the evidence would show appellant was not at the scene of the crime, defense counsel called a single witness, DeAnna Ashorobi, who testified appellant was a friend of her daughter's and she had known him since he was 15 years old. Ashorobi had never heard of appellant being violent and had never known him to carry a gun. She believed him to be a "good kid," mild mannered and respectful. However, she had not heard appellant owned and carried guns; she had not heard he had been involved in fights with a gang; she had not heard of his involvement in a kidnapping; she had not heard appellant's father and others held the kidnapping victim and fired shots at the victim's boyfriend when he arrived to retrieve the victim; and she had not heard appellant held the kidnapping victim at gunpoint and threatened her when he released her. If she had heard about the kidnapping and gun

4

possession, it would affect her opinion and she would assume he was violent if he went to jail or prison for such conduct. Ashorobi had heard about the current homicide, but this did not alter her opinion because appellant had not been found guilty and she did not see him as the kind of person who would shoot someone in the head.

The jury was instructed on first and second degree murder and the firearm enhancement allegations. It acquitted appellant of first degree murder, convicted him of second degree murder, and found the enhancement allegations to be true.

Prior to sentencing, the court granted appellant's motion to relieve his retained trial attorney and substitute new retained counsel. This attorney filed a motion for new trial, asserting the trial attorney had provided ineffective assistance of counsel in several respects, including (1) presenting an opening statement promising an alibi defense that never materialized; (2) calling Ashorobi as a character witness, knowing she would be impeached with highly prejudicial "have you heard" questions about prior criminal acts and possession of firearms by appellant; and (3) failing to object to CALCRIM No. 371 regarding consciousness of guilt and threats to a witness by a third party.[3]

The trial court denied the motion. It stated it had some concerns with the defense strategy of calling Ashorobi as a character witness, but that overall, some positive things came from her testimony in that she tended to humanize appellant. And, though the court had "significant concerns" and was "bothered" about the decision to go forward with an opening statement promising an alibi defense, any error was harmless in light of the very strong and believable testimony by Z.T., which was corroborated by the preliminary hearing testimony of P.L., and the jury's verdict of second, rather than first degree murder. The court noted if appellant testified and offered an alibi defense (as he apparently wished to do before his trial attorney convinced him not to take the stand), he would have been impeached by prior statements to the police as well as prosecution

---

[3] Other instances of ineffective assistance were alleged but are not germane to this appeal, including the failure to object to prejudicial hearsay evidence regarding Tielee P's statements, the failure to develop evidence regarding Tielee P's role in the shooting, and the failure to adequately challenge prosecution evidence regarding the cell phone records.

witnesses who would have shown the substance of the alibi was "based on lies." As to counsel's failure to object to CALCRIM No. 371 regarding consciousness of guilt and threats to a witness by a third party, the court recounted its discussion of the instruction with counsel and indicated the instruction was appropriate.

Appellant was sentenced to prison for 40 years to life, consisting of a term of 15 years to life on the second degree murder count plus a consecutive term of 25 years to life for the finding he had intentionally and personally discharged a firearm causing death under section 12022.53, subdivision (d).

## II. DISCUSSION

### A. *Ineffective Assistance of Counsel*

Appellant argues his trial attorney provided ineffective assistance of counsel in three respects: (1) promising an alibi defense during opening statement on which he did not deliver, (2) calling a character witness that opened the door to cross-examination about whether the witness had heard a number of damaging and prejudicial facts about appellant, and (3) failing to object to hearsay evidence regarding threats made to the victims. We conclude reversal is not required.

#### 1. Ineffective Assistance—General Principles and Standard of Review

A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. To prevail on a claim of incompetent counsel, a defendant must establish by a preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness and it is reasonably probable, but for counsel's error, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-688, 694-695 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218; see U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.)

In resolving an ineffective assistance claim, we give great deference to counsel's reasonable tactical decisions and indulge in the " ' "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) " ' "[C]ourts should not second-guess reasonable, if

6

difficult, tactical decisions in the harsh light of hindsight." ' " (*Ibid.*) If the record on appeal does not shed light on why counsel acted or failed to act, we reject a claim of ineffective assistance unless counsel was asked for an explanation and failed to provide one or there could be no reasonable explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

Because a defendant must establish both incompetence and prejudice, a court need not decide the issue of counsel's alleged deficiencies before deciding if prejudice occurred. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 (*Rodrigues*).) In assessing prejudice, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome, that is, "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." (*Lockhart v. Fretwell* (1993) 506 U.S. 364, 372.)

A claim of ineffective assistance of counsel may be raised in a motion for new trial under section 1181, even though it is not one of the statutorily enumerated grounds. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209 (*Callahan*).) When, as here, the trial court has denied a motion for new trial based on an ineffective assistance claim, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence but reviewing de novo the ultimate question of whether the facts established demonstrate a violation of the right to effective counsel. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725 (*Taylor*).)[4]

---

[4] This standard differs from the abuse of discretion standard applicable to orders *granting* a motion for new trial based on ineffective assistance of counsel or denying a motion for new trial on statutory grounds not implicating a constitutional right. (See *People v. Lightsey* (2012) 54 Cal.4th 668, 729 [applying abuse of discretion standard to denial of motion for new trial based on various grounds]; *People v. Ault* (2004) 33 Cal.4th 1250, 1262 [abuse of discretion is standard for order granting new trial motion; different considerations may apply to orders denying new trial]; *Callahan*, *supra*, 124 Cal.App.4th at p. 201 [same]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7 [discussing different standards of review and noting independent review required of order denying new trial when significant constitutional issue is implicated].)

2.  Factual Background—Claims (1) & (2)

Appellant's first two claims of ineffective assistance of counsel arise from the following facts.

During the hearing on motions in limine, the prosecutor indicated he had just learned about appellant's participation in a kidnapping orchestrated by appellant's father several months before the shooting.  The court granted the prosecutor's motion to allow (1) cross-examination of any character witness called by the defense with "have you heard" questions relating to the kidnapping (see *People v. Marsh* (1962) 58 Cal.2d 732, 745 [it is "within the ambit of proper cross-examination of a character witness to inquire, in good faith, whether the witness has heard of specific misconduct of the defendant inconsistent with the trait of character testified to on direct"]); and (2) extrinsic evidence of the kidnapping incident to impeach appellant's credibility should he testify (see *People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1509 [past criminal conduct involving moral turpitude that has some logical bearing on veracity is admissible for impeachment]; *People v. Zataray* (1985) 173 Cal.App.3d 390, 399-400 [kidnapping is crime of moral turpitude admissible for impeachment purposes]).

At the beginning of the trial, defense counsel indicated he would reserve his opening statement and present it at the close of the prosecution's case-in-chief.  After the prosecution rested its case, defense counsel gave the following opening statement: "Good afternoon, everyone.  I'm going to give you a brief opening statement.  You have heard a lot of evidence so far, but you haven't heard the whole case yet.  My client is not guilty of any of these charges.  He is presumed innocent until all the evidence comes in. And when all this evidence comes in, the People will not have met their burden to prove beyond a reasonable doubt that Mr. Thomas is the person that shot the victim in this case. The witness—it will come out that the witnesses are not credible; that Mr. Thomas was not present.  They have to prove to you that Mr. Thomas was present at the scene, not in or about the area of the scene.  He has to be there, actually be the one doing the shooting. That's not going to pan out in this evidence.  The charge here is murder in the first degree.  Someone did in fact from the evidence you know kill Alvin Burns, but it was

8

not—the prosecution will not be able to show that it was my client because he was elsewhere. He was not at the scene of the crime. That's what the evidence will show. Thank you."

After giving this opening statement, defense counsel called Ashorobi as a witness, who testified about appellant's nonviolent character on direct examination. Ashorobi was then asked a series of "have you heard" questions during cross-examination regarding appellant's involvement in the prior kidnapping, his possession of guns, and his involvement in a fight with a gang. She indicated she had heard none of these things, but if they were proved they would change her opinion about appellant's character.

When Ashorobi's testimony was complete, defense counsel asked to approach the bench and advised the court he did not want appellant to testify as planned because he would be questioned by a "skilled cross-examiner" and his testimony would likely be impeached with evidence about the prior kidnapping. Defense counsel asked for more time to discuss the matter of testifying with appellant. Court was adjourned for the day and the following morning, defense counsel rested without calling any additional witnesses.

### 3. Opening Statement Promising Alibi Defense

Appellant argues his trial attorney was ineffective in making an opening statement in which he promised to present an alibi defense. Case law has recognized the failure of counsel to produce evidence promised to the jury during opening statement may support a claim of ineffectiveness of counsel. (*McAleese v. Mazurkiewicz* (3d Cir. 1993) 1 F.3d 159, 166.) "The rationale for holding such a failure to produce promised evidence ineffective is that when counsel primes the jury to hear a different version of the events from what he ultimately presents, one may infer that reasonable jurors would think the witnesses to which counsel referred in his opening statement were unwilling or unable to deliver the testimony he promised." (*Id*. at pp. 166-167; see *People v. Corona* (1978) 80 Cal.App.3d 684, 725.) That said, an attorney may have valid tactical reasons for changing strategy during trial, and promising certain evidence during opening statement

9

and then electing not to present that evidence is not ineffective assistance per se. (*People v. Burnett* (2003) 110 Cal.App.4th 868, 884-885.)

Defense counsel's opening statement suggested the jury would hear evidence appellant was somewhere other than the scene of the crime when Burns was shot. Apparently, counsel still believed appellant would testify and present an alibi defense. But the reasons counsel gave the court shortly after his decision to try to dissuade appellant from taking the stand (the expertise of the prosecutor as a cross-examiner and the prejudice that would result from impeachment evidence regarding the kidnapping) were known from the outset of the trial. We share the trial court's concern about defense counsel's decision to suggest an alibi defense when it appears he should have known at the time of the opening statement it would be improvident for appellant to testify.[5] Ultimately, though, we need not resolve whether counsel's actions fell beyond the range of reasonable trial tactics because any error in making the opening statement was harmless. (*Strickland*, *supra*, 466 U.S. at pp. 694-695; *Rodrigues*, *supra*, 8 Cal.4th at p. 1126.)

The decision to forgo alibi testimony by appellant himself is not challenged on appeal and appears reasonable in light of the potential for impeachment with highly prejudicial information about the prior kidnapping. There is no suggestion any other witness could have given testimony supporting a persuasive alibi defense. Absent any evidence of an alibi, the crucial issue for the jury to resolve was whether Z.T. and P.L. were credible when they identified appellant as the shooter.

The trial court, which presided over the entire case and observed the demeanor of the witnesses firsthand, found Z.T. to be "as good or better than any other witness I have ever seen. There were some times when she cried on the witness stand. She did not seem to be pandering her answers to one side or the other. . . . And when you look at her

---

[5] In a declaration submitted with the motion for new trial, appellant stated he and his trial attorney had agreed before the trial began that appellant would testify, and the issue was not revisited until the day counsel gave his opening statement, when he urged appellant not to take the stand.

answers what, at first, seemed to be inconsistent answers, depending on who was asking the question, ultimately showed to be quite consistent, that her testimony was consistent throughout, front to back, and as each attorney asked about a different aspect, her answer might have changed because she was answering that question. And ultimately it was clarified that at the time that the shot was fired, she was looking down, but she recognized Mr. Thomas' voice, and Mr. Thomas['] voice was not the voice that she heard for the first time that day, but someone who she had a significant amount of contact with in the months before that, a lot of telephone contact. She didn't seem to me to be siding with one side or the other. She seemed to me to be a person who had positive feelings toward Mr. Thomas, as well as positive feelings towards the victim in this case. Her identification of Mr. Thomas was very strong. . . . It was very certain. It was based on having known Mr. Thomas for some period of time, having recognized him from a distance away, having recognized him walking toward the vehicle . . . ." The court also noted P.L. "overwhelmingly corroborated" Z.T.'s testimony in material respects. "The fact that there are two percipient witnesses who had preexisting relationships with the defendant who both affirmatively and positively and 100 percent identified the defendant as the shooter, that's very strong evidence indeed." Finally, the court observed the identification was further corroborated by cell phone records showing appellant was in the general area of the shooting, by the gold grill found on his person at the time of his arrest, and by his Youth Uprising membership card that was found at his girlfriend's house.

Substantial evidence supports the trial court's determination Z.T. was a credible witness, and we defer to that finding. (*Taylor*, *supra*, 162 Cal.App.3d at p. 726.) Her persuasive testimony, corroborated by the other evidence described by the trial court, identified appellant as the shooter. Once the jury determined appellant was the shooter, the jury's only realistic choices were first or second degree murder. It convicted appellant of the lesser of these two offenses.

Though defense counsel's opening statement alluded to an alibi defense that was not ultimately presented, it focused more on the credibility of prosecution witnesses and

11

made no promise that any particular defense witness would testify. It is not reasonably probable appellant would have secured an acquittal had defense counsel refrained from making his opening statement or limited its contents to an attack on witness credibility, even if such a strategy would have been preferable in hindsight. (*Strickland*, *supra*, 466 U.S. at pp. 694-695.)

4. Calling Ashorobi as a Character Witness

Appellant contends defense counsel was ineffective in calling Ashorobi as a character witness, knowing she would be cross-examined with a series of "have you heard" questions about a "litany of unsavory behavior on appellant's part." The decision to call a particular witness is generally a matter of trial tactics "unless the decision results from unreasonable failure to investigate." (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) The decision to call Ashorobi does not appear to be the product of ignorance on the part of defense counsel, who knew in advance she could be impeached by the "have you heard" questions.

Even assuming the tactical decision to call Ashorobi was unreasonable, appellant has failed to demonstrate prejudice for the reasons stated in the preceding section of this opinion. Given the evidence presented, and the strength of Z.T.'s testimony in particular, there was very little potential for a verdict other than first or second degree murder. The jury chose the lesser of these options, showing it was not unduly swayed by the prosecutor's references to the prior kidnapping and possession of firearms. The trial court specifically instructed the jury it could not consider the prosecutor's questions for the truth of the matters asserted.[6] Though, as appellant notes, the prosecutor referred to this line of cross-examination during closing argument, the jury was instructed the

---

[6] "Ladies and gentlemen, I'm going to give you a limiting instruction. You just heard a series of questions on cross-examination that started with, 'Have you heard.' Now, those questions and the answers I'm ordering you to limit your consideration of that to the credibility of the character witness. You're not to consider the substance of those questions and answers for the truth of the matter asked from the question. So those questions and all those answers simply go to your evaluation of the credibility or believability of this character witness and your evaluation of her opinion. Okay? There is no evidence before you related to those other events."

12

attorneys' remarks during opening statement and closing argument were not evidence. We presume the jury followed these admonitions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.)

5. Failure to Object to Hearsay

The third instance of alleged ineffective assistance is based on trial counsel's failure to object to hearsay statements on a recording of the identifications made by Z.T. and P.L. during the photographic lineups at the police station. In particular, appellant complains his trial counsel did not object to a conversation between the witnesses, their "caretaker," and the detectives regarding the need to keep secret the witnesses' locations, the phone calls made to Z.T.'s cell phone from appellant's, what to do in case of future threats, and promises the witnesses would be protected.

The recording was admitted because it contained prior consistent statements under Evidence Code section 1236 and prior identifications under Evidence Code section 1238. Defense counsel did not object to the recording and stated he believed the discussion about the witnesses' safety was duplicative of evidence the jury had already heard regarding their fears. The court ultimately interposed its own objection under Evidence Code section 352 and stopped the playing of the recording partway through because the court "started flipping ahead [in the transcript], and what appeared to [the court] were there were long paragraphs in the transcript of the police talking, not very much of the witnesses talking," which were not very probative of any of the issues in the case.

Although some of the material excluded by the court might have been relevant for the nonhearsay purpose of showing the effect of the police officers' statements on the witnesses and their credibility when they testified, we assume, based on the court's decision to cut short the evidence, it would have sustained a defense objection under Evidence Code section 352. But for the same reason defense counsel decided not to object, we conclude any deficiency in failing to do so was harmless. To the extent the conversations showed Z.T. and P.L. were concerned about their safety and mentioned the calls from appellant's phone to Z.T.'s, that information was already before the jury. To the extent the officers offered advice about staying hidden and reporting any threats,

13

those were the kind of statements that would be expected in any murder investigation of this nature. No information about appellant was offered by the officers, and their reassurances and general expressions of concern were unlikely to have had any impact on the jury. Appellant has not shown it is reasonably probable he would have obtained a more favorable verdict if the challenged statements had been excluded. (*Strickland*, *supra*, at pp. 694-695.)

### B. *CALCRIM No. 371*

Appellant argues he is entitled to reversal because the court gave CALCRIM No. 371 regarding consciousness of guilt based on direct or indirect efforts to discourage testimony. We disagree.

During her testimony, Z.T. described her fear of getting involved in the case and testified about calls made to her cell phone, which she did not answer because she did not want to talk. She also testified appellant had not threatened her. In light of this testimony, the court decided to give a limiting instruction during the trial advising the jury it should not consider evidence of threats against Z.T. unless appellant was linked to those threats. Defense counsel did not object, and the court instructed the jury as follows: "We've had some evidence from a witness now, [Z.T.], related to witness intimidation or fear of retaliation. Evidence related to whether a witness feels intimidated or feels that they've been intimidated or that they have a fear of retaliation is relevant to the witness's state of mind, attitude, actions, bias, prejudice or lack or presence thereof. [¶] Evidence that a witness is fearful of retaliation relates to that witness's credibility and is therefore admissible. For this evidence to come before you it is not necessary to show that the threats against the witness, if there were any, were made by the defendant personally. For you to consider that evidence as any sort of consciousness of guilt against the defendant, you are going to have to find that the defendant either made the threats or authorized others to make the threats. [¶] I don't know what the evidence is going to show in this case by the time we're done with all of the evidence. I'm hearing it for the first time just as you are. Thus far I have not heard anything this morning that links any threats or intimidation to the defendant personally. You may have heard something I

14

didn't, I don't know. Ultimately you are going to be the judges of the facts and will make these decisions. But at this point you should consider that evidence in evaluating the credibility of the witness only. You can't hold it at this point against the defendant unless you first find that he either made the threats or authorized the threats."

At the close of the case, the court gave a version of CALCRIM No. 371 regarding the suppression or fabrication of evidence and consciousness of guilt: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, or discouraged someone from testifying, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself."

Defense counsel objected to the first paragraph of CALCRIM No. 371, arguing no evidence had been presented to show appellant tried to hide evidence or discourage anyone from testifying. The court indicated the jury could conclude appellant attempted to hide evidence by discarding a cell phone when he was arrested, and, while the evidence was "on the weak side," it could also determine the calls made from appellant's phone to Z.T.'s phone after the shooting were efforts to discourage her from cooperating with the police. Defense counsel did not object to the second paragraph of the instruction, regarding threats by third parties, because evidence of one third-party threat had been presented and the instruction "set[ ] the bar kind of high for the prosecution" with respect to linking that threat to appellant.

The court did not err in giving CALCRIM No. 371. "A trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the

15

instructions." (*People v. Bowman* (2011) 202 Cal.App.4th 353, 366.) The calls to Z.T.'s cell phone and appellant's apparent attempt to discard his own phone when fleeing from the police supported an instruction regarding attempts to suppress evidence and consciousness of guilt. The instruction was beneficial to the defense because its cautionary language admonished the jury to "circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224; see *People v. Holloway* (2004) 33 Cal.4th 96, 142 [analyzing CALJIC No. 2.04, equivalent instruction to CACRIM No. 371].)

We also conclude any error was harmless. If, as appellant contends, the evidence did not support CALCRIM No. 371, there is no reason to believe the jury would have relied on that instruction in determining guilt. The court had previously admonished the jury there was no evidence appellant had threatened Z.T., and no evidence linked appellant to the threatening call received by P.L. There is no reasonable probability the inclusion of CALCRIM No. 371 changed the result of the trial, and any error in giving it was harmless under any standard. (*People v. Crew* (2003) 31 Cal.4th 822, 849.)

## C. *Cumulative Error*

Appellant argues the errors cited above were cumulatively prejudicial and require reversal, even if they were individually harmless. We disagree. To the extent we have assumed error for purposes of analysis, none of these errors increases the impact of any other and their cumulative impact did not deprive appellant of a fair trial or the right to due process. (*People v. Thomas* (2011) 51 Cal.4th 449, 508.)

16

## III.  DISPOSITION

The judgment is affirmed.

 

 

 

                                                  _____

                                                  NEEDHAM, J.

 

We concur.

 

_____

JONES, P.J.

 

_____

SIMONS, J.