Filed 12/18/13  P. v. Abadir CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | E052989 |
| Plaintiff and Respondent, | (Super.Ct.No. RIF143161) |
| v. | **ORDER MODIFYING OPINION AND DENIAL OF PETITION FOR REHEARING** |
| CHRISTIAN SAMIR ABADIR, |  |
| Defendant and Appellant. | **[NO CHANGE IN JUDGMENT]** |

Appellant's petition for rehearing filed December 16, 2013, is denied.  The opinion filed in this matter on December 5, 2013, is modified as follows:

On page 3, the first full paragraph should read as follows:

The trial court neither imposed nor struck the section 451.1, subdivision (a)(5), enhancement on count 1.  Accordingly, the case should be remanded for the limited purpose of allowing the court an opportunity to exercise its discretion in this regard.  Additionally, as conceded by respondent, the trial court should have sentenced defendant to one year the midterm, not three years, on count 2 for insurance fraud.  (§§ 550, subd.

1

(a), and 1170.1, subd. (a).)  Otherwise, we affirm the judgment.

On page 24, the disposition should read:

We remand for the limited purpose of allowing the trial court to exercise its discretion to impose or strike the section 451, subdivision (a)(5), enhancement on count 1, and to correct the sentence on count 2 from three years to one year.  Otherwise we affirm the judgment.

Except for this modification, the opinion remains unchanged.  This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

McKINSTER
Acting P.J.

MILLER
J.

2

Filed 12/5/13 (unmodified version)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E052989 |
| v. | (Super.Ct.No. RIF143161) |
| CHRISTIAN SAMIR ABADIR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Paul M. Bryant, Jr., Judge. (Retired judge of the San Bernardino Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6, of the Cal. Const.) Affirmed with directions.

Helios J. Hernandez, III; Mark D. Johnson, under appointment by the Court of Appeal; and Christopher R. Wagner, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Vincent Lapietra, and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION[1]

Defendant Christian Samir Abadir hired two men to burn down his house. He then filed claims against his homeowner's insurance policy for the losses. Defendant was charged with arson and related crimes.[2] In his first trial, defendant testified and the jury was unable to reach a verdict on the charges, although the majority voted in favor of guilt. Defendant did not testify at his second trial and the jury convicted him.

The trial court denied defendant's motion for a new trial, which was based on ineffective assistance of counsel and other grounds. The trial court sentenced defendant to prison for eight years.

On appeal, defendant contends the trial court erred in denying his new trial motion because his trial counsel was ineffective when he discouraged defendant from testifying at his second trial, as well as when he failed to communicate with him, to investigate the case, and to move for a mistrial based on jury tampering. We conclude the trial court properly exercised its discretion in denying the new trial motion because defendant failed to establish that trial counsel's performance was deficient or that any prejudice resulted

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] The third amended information, removing three codefendants, charged defendant with arson of an inhabited structure (§ 451, subd. (b); count 1), caused by a device designed to accelerate the fire or delay ignition (§ 451.1, subd. (a)(5)), and for pecuniary gain (§ 456, subd. (b)); possession of an incendiary device (§ 453, subd. (a); count 2); insurance fraud (§ 550, subd. (a); count 3); and obstructing a police officer (§ 148, subd. (a)(l); count 4).

from the alleged deficiencies.  In addition, defendant forfeited any new issue not raised below in the new trial motion.

The trial court neither imposed nor struck the section 451.1, subdivision (a)(5), enhancement.  Accordingly, the case should be remanded for the limited purpose of allowing the court an opportunity to exercise its discretion in this regard.  Otherwise, we affirm the judgment.

II

THE TRIAL AND POSTTRIAL MOTION

The prosecution's theory of the case was defendant was struggling financially and planned the arson of his residence in order to claim the insurance money.[3]

Around 2:30 a.m. on March 31, 2008, firefighters responded to a call regarding a fire at defendant's two-story residence in Temecula.  After the fire was extinguished, officials found one Bic-style lighter on the entryway adjacent to the front door, another lighter in the kitchen and dining room area, and an empty gasoline can in the garage.

Defendant was with his wife, Karine, at a hotel in Coronado.  Defendant's neighbor and the fire chief talked to defendant on his cell phone.  Defendant said he could not come back immediately because he had been drinking.

A.  *Karine's Testimony*

Karine testified at trial as part of a plea agreement, providing that she would be permitted to plead guilty to insurance fraud and would be granted probation.  Karine

admitted that she and defendant were struggling financially and were using prescription drugs and cocaine. Defendant proposed to torch the house to solve their financial problems. They performed an inventory of their possessions for insurance purposes and they put irreplaceable items in storage.

Karine said that defendant paid Nicholas Hernandez and Clifford Gandy, two employees of his home loan processing company, about $5,000 to set the fire. Gandy was supposed to use gasoline to start the fire and Hernandez would pick him up afterward. Defendant placed two containers of gasoline in the laundry room. Gandy was supposed to set fire to the house after defendant and Karine left for Coronado.

On the day of the fire, defendant picked up Gandy and brought him to the house. Karine and defendant took clothing, toiletries, their dogs, defendant's diploma, financial records, and a painting of a dog to Coronado with them. They also took both their cars, a Mercedes and a Lexus. On the way to Coronado, they stopped at Hernandez's house and gave Hernandez a walkie-talkie to communicate with Gandy. Early the next morning, Gandy, Hernandez and Hernandez's girlfriend arrived at defendant and Karine's hotel room and Gandy told them, "it was done."

Consistent with Karine's testimony, two neighbors testified that, before the fire, they saw defendant loading items into a U-haul truck that was parked in front of his house. In the rented storage unit, officials found a photograph album that contained

_____

*[footnote continued from previous page]*
**3** We deny defendant's request for judicial notice filed December 17, 2012. (Evid. Code, §§ 451, 452, & 459.)

photographs of defendant and Karine; Karine's baby book; a note pad with a handwritten inventory of clothing; and a note pad containing an inventory of CDs, DVDs, and home appliances with serial numbers.

After the fire, the insurance company paid an advance of $20,000 which Karine used to pay bills and go shopping at Macy's.

## B. Hernandez's Testimony

Hernandez claimed that Karine, not defendant, had approached him about burning the house. Hernandez testified that defendant asked him to pick up Gandy and bring some money to Coronado. Hernandez picked up Gandy at a location about two blocks away from defendant's house. He then drove his girlfriend and Gandy to Coronado. Hernandez denied committing burglary and insurance fraud although he pleaded guilty to those crimes.

## C. Gandy's Testimony

Gandy confirmed that he, Hernandez, and Hernandez's girlfriend drove to Coronado. Gandy denied involvement in the arson but pleaded guilty to burglary and signed a plea agreement, stating: "I entered [defendant's house] with the intent to burn the structure. I knew this house belonged to [defendant]. He gave me permission to enter this dwelling house for the purposes of committing an arson. He told me he would file an insurance claim for the loss."

## D. The Investigation

In an interview a week after the fire, defendant told the arson investigator that he and Karine had gone to Coronado to celebrate their wedding anniversary. Defendant

5

learned about the fire during a telephone call from his alarm company around 2:15 a.m. After Karine became hysterical, defendant called Hernandez and his girlfriend to come to the hotel to comfort Karine. Defendant tried to drive home that night but he decided to remain in Coronado after he fell asleep at a stop sign.

In the Temecula hotel room where defendant and Karine were staying after they returned from Coronado, officials found a painting of a dog, defendant's college diploma, and large amounts of men and women's clothing. When officials interviewed Karine in the hotel conference room, Karine refused to speak with defendant. Meanwhile, defendant was in the hotel lobby, cussing and yelling at the front desk clerks because he was not allowed to talk to his wife. Defendant eventually exited the lobby and ran outside the hotel to bang on the conference room window, yelling, "Karine, I need to talk to you." The fire chief warned defendant to stop but defendant persisted and the fire chief arrested him for obstruction.

The arson investigator determined there were 12 separate fires in defendant's house. After ruling out electrical and other potential causes, the arson expert opined the "fires were arson-caused through the use of ignitable liquids and ignitable liquid trailers." The arson investigator explained that gasoline was poured at the 12 different origin sites which were connected with a trail of gasoline. Once the fire was started, the gasoline acted "like a fuse on a firecracker," carrying the fire to different flare-up points. The parties stipulated that all samples obtained from defendant's home tested positive for the presence of gasoline.

6

The arson investigator searched Gandy and Hernandez's residence in Murietta and found $3,540 in the trunk of defendant's Mercedes–parked in the garage–more money in Hernandez's bedroom, and some of the DVD's that Karine had described. When Gandy and Hernandez were in the back of a patrol car together after the search, Gandy said, "I wonder if [defendant] gave up our names to save his ass[.]" Hernandez responded, "We should just give him up."[4]

## E. Defendant's Case

Defendant's counsel, C. Reginald Taylor, cross-examined Karine at length. Defendant did not testify and Taylor did not introduce evidence. Instead, Taylor argued that it was implausible that Gandy could have set the fire and that Gandy had denied he had done so, as well as not recalling the details of his plea agreement. Gandy had a prior strike and risked receiving a six-year sentence instead of a two-year sentence. Taylor challenged Karine's credibility because she had received a nine-month sentence and she could not remember details about the couple's finances. During cross-examination, Hernandez denied his crimes and claimed he was pressured to take a plea agreement for 20 months.

## F. The New Trial Motion and Ruling

After trial, defendant's new counsel filed a motion for new trial arguing that Taylor was ineffective in failing to: (1) call witnesses, including defendant; (2)

---

[4] Defendant's belated hearsay objection on appeal is not cognizable.

7

investigate the case; (3) provide zealous representation; and (4) communicate with defendant.

*1. Taylor's Testimony*

The court heard Taylor's testimony about representing defendant at both trials.

Before the first trial, Taylor explained to defendant that he had a constitutional right to testify and he did not have to do so but that it was in defendant's best interest to testify so the jury could hear his side of the story rather than only Karine's. Defendant had a minimal criminal history. He had not confessed to the police and his statements to the insurance investigator and Cal Fire were consistent with what defendant told Taylor. Taylor warned defendant against testifying in the style of O.J. Simpson because the jury would react unfavorably.[5]

In the first trial, defendant testified on his own behalf about the state of his finances and Taylor cross-examined Karine on the subject. Taylor also presented evidence about defendant's home alarm system.

The first jury voted 10 to two in favor of guilt on the arson and insurance fraud charges and 11 to one in favor of guilt on the obstruction charge. In posttrial interviews the jurors described Karine as "America's sweetheart, little young, blond-haired, blue-eyed girl and here's this guy, who comes in and corrupts this poor girl." The jurors

---

[5] Taylor explained what he meant was that defendant should not follow the example of O.J. Simpson in the book he wrote and "come across like if I did it, I would have done it this way. . . . [¶] . . . gaming the system. . ." by saying, "'why would I do this? If I was going to commit arson and fraud, why would I do [this]? I would have done it this way.'"

thought defendant "was obnoxious; they thought he was kind of smarting off to the District Attorney." The jurors did not like defendant or find him credible. Taylor summarized: "Suffice it to say, the jury's impression of him was not positive at all. And it--in my opinion, it was detrimental in our first trial. The jurors' impression was very detrimental."

Taylor further testified that he met with defendant at least two or three times for a total of a couple of hours before the first trial. Between the first and second trial, Taylor met with defendant in his office. The two spoke several times at court appearances. In several conversations, defendant was indecisive about whether he should testify at the second trial. Taylor advised him to wait and see how the second trial unfolded. Taylor's investigator also talked to defendant and tried to contact some witnesses from the insurance company. The investigator did not talk to defendant's parents. Taylor asked for continuances so defendant could retain other counsel but defendant did not want to waive time and he did not ask to replace Taylor. Defendant never criticized Taylor's representation.

Taylor did not call any witnesses at the second trial. Taylor did not call defendants' parents or proposed character witnesses to testify because they did not possess probative information. Taylor did not present any financial documents during either trial and did not introduce any other documents during the second trial. Defendant sent Taylor his bank records after the first trial and Taylor used the bank records to cross-examine Karine. Karine did not appear credible because she could not remember

9

anything about finances, including simple questions about whether they had money in the bank.

During a recess after the prosecution's case-in-chief, Taylor reiterated to defendant his concerns from the first trial about defendant being a poor witness who volunteered unnecessary information, argued with the prosecutor during cross-examination, and antagonized the jury. Taylor never instructed defendant not to testify during the second trial and defendant never asked to testify.

2. *Defendant's Testimony*

Defendant contradicted Taylor on several points. Defendant testified that he never met with Taylor outside of court before he testified at the first trial. He had only spoken with Taylor for about 20 to 30 minutes when Taylor made two or three court appearances on defendant's behalf and he talked with Taylor during the first trial.

Defendant asserted the first jury voted 11 to one in favor of guilt on the obstruction charge and nine to three in favor of guilt on the felony counts. Taylor talked with him for about two hours after the first trial, telling him the jurors thought he had acted like a "smart ass, maybe being arrogant . . . ." Taylor also told defendant that he wanted to conduct "extensive investigations" before the second trial.

Defendant tried to meet with Taylor several times again before the second trial but Taylor never responded to email, hand-delivered notes, cell phone calls, and messages delivered by third parties. Taylor never contacted defendant's list of potential witnesses, including character witnesses. Defendant also could not meet with the defense investigator without Taylor's approval.

10

Defendant asserted that his bank statements showed an average deposit of $14,500 per month in his business account, more than what he had estimated during the first trial. These documents were not introduced into evidence at trial or at the hearing on the new trial motion. Defendant estimated his monthly expenditures were about $13,000 or $14,000 a month. Defendant claimed he paid his bills on time: "The few bills that were presented, when it was stated that some of the utilities had been cutoff or at times were in default were incorrect." Defendant also claimed his credit cards were paid in full before the fire. Defendant admitted he was behind on his property taxes but he had not paid because he was angry about a $500 late charge when his payment was less than eight hours late.

During the second trial, Taylor asked for a recess after the prosecution rested, took defendant into a corridor, and told him, "'I'm against putting you on the stand.'" "'I do not want you to pull an O.J.'" Defendant protested that he could refute the evidence. Defendant asked Taylor to introduce his bank accounts to show that he was "not financially hurt." Defendant reminded Taylor of his advice during the first trial that it was "'imperative'" that he testify because it was Karine's word against his. Taylor told defendant Karine's testimony was weak during the second trial. The two argued about the relative credibility of Karine and defendant. Defendant nonetheless told him, "'I want to testify.'" Taylor replied, "'We don't have time to discuss this any further. Let me drive.'"

Defendant was not happy with Taylor's representation at the first trial but he "was indigent." He never objected during the second trial because he "wasn't aware that [he]

11

had that right." During the second trial, he repeatedly complained about the quality of Taylor's representation but they also joked around and had an amicable relationship.

### 3. The Prosecutor's Testimony

The prosecutor testified that many exhibits showing the termination of defendant's credit by banks and credit companies were disclosed to the defense and presented as exhibits at both trials. The prosecutor also identified at least 18 specific and major inconsistencies in defendant's testimony in the first trial which he intended to use in cross-examining defendant.

### 4. Court's Ruling

After listening to argument, the court stated that it did not find defendant credible and that it appeared defendant was happy with Taylor's representation until he received an adverse result. The court concluded, "I do not believe that Mr. Taylor's representation fell below the requisite standard, and I've seen no evidence put before me that would cause me to believe that." Accordingly, the court denied the motion.

III

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant urges the trial court abused its discretion in denying his new trial motion based on ineffective assistance of counsel (IAC) because his counsel discouraged him from testifying and failed to communicate with him, to investigate the case, and to move for a mistrial based on jury tampering. We conclude defendant failed to establish that counsel's performance was deficient or prejudicial and that defendant forfeited the remaining claims, which also lack merit.

12

*A. Legal Principles*

A trial court has broad discretion in ruling on a new trial motion: "''"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 524.)

If defendant contends he received IAC at trial, "[t]he trial judge is the one best situated to determine the competency of defendant's trial counsel. Where, as here, defendant is represented by different counsel at the motion for a new trial and the issue is called to the trial court's attention, the trial judge's decision is especially entitled to great weight and [a reviewing court must] defer to his fact finding power." (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483; *People v. Fosselman* (1983) 33 Cal.3d 572, 582.)

For similar reasons, the standard for reviewing counsel's performance is also deferential. (*People v. Holt* (1997) 15 Cal.4th 619, 703.) "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." (*Harrington v. Richter* (2011) 562 U.S. __, __ [131 S.Ct. 770, 788] (*Harrington*).) The question is whether an attorney's representation amounted to incompetence under "'prevailing professional norms.'" (*Id.* at p. 788.)

In considering a claim that trial counsel provided ineffective assistance, a reviewing court "presume[s] that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt, supra,* 15 Cal.4th at p. 703, citing *Strickland v. Washington* (1984) 466 U.S. 668, 690

[104 S.Ct. 2052, 80 L.Ed.2d 674].)  Consequently, a defendant bears the burden of establishing:  "'(1) that counsel's performance fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted.'"  (*Holt,* at p. 703.)  Counsel's errors must be so serious as to deprive the defendant of a fair trial.  (*Harrington, supra,* 131 S.Ct. at p. 703*; Strickland,* at p. 687.)  A claim of IAC may be resolved based on lack of prejudice alone.  (*Strickland,* at p. 697; *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)  Defendant did not come close to surmounting *Strickland's* high bar in this case.  (*Harrington,* at p. 703.)

## B.  Taylor's Advice About Testifying

Taylor testified that he never told defendant that he could not testify or that he did not want him to testify.  The trial court expressly found defendant's contrary testimony was not credible.  Because substantial evidence supports the trial court's credibility determination, this court must accept it.  (*People v. Callahan* (2004) 124 Cal.App.4th 198, 235-236.)  The record also supports that Taylor properly advised defendant about not testifying in the second trial.  Taylor candidly warned defendant that he had been a poor witness and the jury had not liked him or believed him.  Taylor also told defendant that, although he did not think Karine was as strong a witness during the second trial, the jury would be comparing the two and defendant might not fare well in comparison.  Furthermore, the prosecution was threatening to expose the inconsistencies in defendant's statements and testimony.  In view of the foregoing, counsel was not ineffective in

14

advising defendant to wait until after the prosecution's case-in-chief to make a definitive decision about whether he wanted to testify.

In *People v. Andrade* (2000) 79 Cal.App.4th 651 and *People v. Callahan, supra,* 124 Cal.App.4th 198, appellate courts did not find an abuse of discretion in granting new trials based on counsel's ineffective advice to the defendants not to testify. (*Andrade,* at pp. 660-661; *Callahan,* at p. 214.) In *Andrade,* the court observed the defendant had no substantial criminal history, would not have been subject to substantial impeachment, and was the only person who could provide an explanation for his presence at two different homes. Without the defendant's testimony, the jury had no alternative but to accept the prosecution's theory that the defendant entered the homes to commit rape. (*Andrade,* at pp. 660-661.) In *Callahan,* the appellate court noted the trial court found the defendant's testimony at the hearing on the new trial motion was more favorable than the piecemeal presentation of her pretrial statements to the police. The appellate court also noted the trial court had the opportunity to view the defendant's demeanor on the stand and had concluded that the defendant's testimony "would have placed her in a better light" than her tape recorded statements that were played for the jury. (*Callahan,* at p. 214.) The appellate court concluded that, the trial court implicitly found that the defendant would make a good appearance on the stand. (*Ibid.*)

The trial court here, unlike the courts in *Andrade* and *Callahan,* did not find defendant to be credible. Additionally, Taylor observed defendant's poor performance in the first trial and the jury's response to him. The prosecutor also planned to impeach defendant based on his inconsistencies and drug use. Finally, the jury heard defendant's

15

statements about the fire during the arson investigator's testimony.  Taylor argued, based on Karine's testimony on cross-examination, that defendant and his wife were not struggling financially at the time of the fire.  *Andrade* and *Callahan* do not support defendant's argument that the trial court abused its discretion in denying defendant's new trial motion based on Taylor's advice about whether he should testify.

Defendant also argues Taylor should have presented another witness but defendant has not identified another witness or what testimony another witness would have provided.  (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1093.)  Finally, defendant's claim fails because there is no reasonable probability that he would have received a more favorable result had he testified in his own defense based on his performance as a witness, the numerous inconsistencies, and the overwhelming evidence of defendant's guilt as detailed comprehensively above.  Accordingly, defendant has failed to establish he was prejudiced by Taylor's advice about testifying at the second trial.

C. *Taylor's Communications with Defendant and Investigation*

Taylor testified he met with defendant before the first trial for about two hours in total.  Between the first and second trial, they met in Taylor's office and spoke in court.  The trial court found defendant was not credible.  Defendant has not shown that his communication with Taylor was constitutionally deficient or that he was prejudiced by the lack of additional communication.  (*United States v. Rogers* (9th Cir. 1985) 769 F.2d 1418, 1425) [no ineffectiveness without a showing of what deficient consultation missed].)

16

Defense counsel has a duty to make a reasonable investigation or to make a reasonable decision that a particular investigation was unnecessary. (*Strickland v. Washington, supra,* 466 U.S. at pp. 690-691; *In re Andrews* (2002) 28 Cal.4th 1234, 1254.) A reviewing court considers the objective reasonableness of the decision in light of all the circumstances, under the prevailing norms. (*Wiggins v. Smith* (2003) 539 U.S. 510, 521-523.) The court applies "a 'heavy measure of deference to counsel's judgments.'" (*Rompilla v. Beard* (2005) 545 U.S. 374, 381.) The court considers the known evidence and also whether the known evidence would lead a reasonable attorney to investigate further. (*Wiggins,* at p. 527.)

Defendant complains Taylor had only "sparse" communication with him and directed his investigator to interview only defendant. The record shows that Taylor communicated sufficiently with defendant and that the investigator also attempted to contact some witnesses from the insurance company. Taylor considered and rejected using defendant's parents and his proposed character witnesses. Defendant did not identify any additional witnesses or their proposed testimony. Accordingly, his claim fails. (*People v. Beasley, supra,* 105 Cal.App.4th at p. 1093.)

Defendant also asserts that, if Taylor had interviewed his parents he would have learned that they provided defendant with financial support, showing he was financially stable. "Whether to call certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate." (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) As noted, however, Taylor decided not to call the parents as witnesses, although he knew they provided financial support, because the parents did not

17

have any probative information about what happened. Taylor's decision not to call the parents was a reasonable trial tactic and, for the reasons discussed earlier, no prejudice ensued.

Defendant also faults Taylor for failing to investigate and present evidence showing that he had no financial motive to commit arson, in particular, that defendant had deposited more than $115,000 into his business account over an eight-month period.[6] Taylor did not introduce the bank statements but he used them to elicit testimony from Karine that she could not remember any details about their finances, including whether they were behind on any bills around the time of the fire, whether the business had profits or losses, and whether the balances in their checking, savings and business accounts were positive or negative. Karine finally believed they were only a couple of weeks behind in their mortgage payment and had not had any utilities shut off for nonpayment. Taylor then argued during closing that Karine's testimony that she and defendant were not struggling financially was not credible.

Taylor's decision to rely on the weaknesses in Karine's testimony rather than present the bank statements was a reasonable tactical choice. Furthermore, in support of his new trial motion, defendant testified that he was operating on a very small financial margin, apparently spending most if not all he earned. Given the overwhelming evidence of guilt, it is not reasonably probable that defendant would have received a more

---

**6** The bank records are not "newly discovered evidence" as defendant attempts to argue in his reply brief. Defendant repeats his arguments about the bank records in his supplemental opening brief.

18

favorable result if the bank records were introduced at the second trial or had been presented in the new trial motion, even if the court mused they might have been relevant. The records should not be made the subject of a writ petition because they do not constitute newly-discovered evidence.

Defendant also challenges Taylor for not discovering a video showing entry to and from the storage unit and failing to investigate the truth of Karine's statement to the fire chief that defendant purchased "fire implements" from the Wal-Mart and 7-Eleven in Temecula. Defendant claims an investigator for defendant's parents found a Walmart receipt for March 30, 2008, indicating that a credit card in Karine Abadir's name was used to purchase Zippo fuel and lighters. A Zippo lighter was found at the scene and entered into evidence.

First, defendant's argument is not based on evidence in the record, it was not raised in the new trial motion, and has been waived. (*People v. Verdugo* (2010) 50 Cal.4th 263, 309.) This claim of error is also not cognizable on appeal because it relies on evidence outside the record, a purported investigation that occurred more than six months after the court denied the new trial motion. (*People v. Williams* (1988) 44 Cal.3d 883, 917, fn. 12.) Next, Karine may have purchased Zippo fuel and lighters even if defendant purchased the "fire implements." Third, the assertion that videotapes of the storage unit would have helped the defense is entirely speculative. Finally, defendant did not tell Taylor that he did not buy any lighters or enter the storage facility. Counsel is "entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." (*Harrington, supra,* 131

19

S.Ct. at p. 789.)  Finally, in light of the overwhelming evidence of defendant's guilt, it is not reasonably probable he would have received a more favorable result if such evidence had been uncovered and presented at trial.

*D.  Other Claims About Taylor*

By failing to raise them in his motion for new trial, defendant has forfeited other claims, such as Taylor not arguing that an arsonist broke into defendant's house based on the evidence that (1) window glass was found inside the downstairs home office, and (2) the neighbor's wife heard a big bang about 30 minutes before the fire.  (*People v. Verdugo, supra,* 50 Ca1.4th at p. 309.)  In any event, the arson investigator opined the downstairs window broke during the fire.  As to the neighbor's wife, the neighbor testified that he and his wife both awoke to a popping sound and, when he looked out the window, he saw flames coming from the house.  Additionally, Gandy pled guilty to entering defendant's house with the intent to commit arson, and the evidence of defendant's guilt was overwhelming.

Taylor argued the unreasonableness of the People's theory that Gandy remained motionless in the house from 7:00 p.m. until 2:00 a.m. the next day, when the motion detector alarm went off inside the house, and pointed out that the arson investigator's investigation of the area around the broken window was inadequate.  In view of these circumstances, Taylor was not deficient in failing to argue that the arsonist broke into the house and defendant was not prejudiced by the absence of such an argument.

Finally, on the issue of whether Taylor should have obtained full transcripts from the first trial, Taylor testified that defendant did not want to waive time. Defendant has not established any prejudice on this point.

*E. Jury Tampering*

Defendant's claim of "prosecutorial jury tampering" was also forfeited. (*People v. Verdugo, supra,* 50 Cal.4th at p. 309.) In any event, the record contradicts his claim.

After a recess, the court announced outside of the jury's presence that a victim witness advocate from the district attorney's office had overheard comments by one of the jurors. The advocate then testified that, when she was out in the hallway, she saw Juror No. 10 point at his head and state, "What is it with D.A.s? . . . Do they have a hole drilled in their head?" A female juror replied it could be a frontal lobotomy. Juror No. 10 said, "No." The victim advocate did not know whether the jurors were talking about the prosecutor conducting examination or the prosecutor testifying as a witness.

The court referred to the advocate as a "spy" but then clarified there was nothing wrong with her assisting Hernandez when he testified. Juror No. 10 explained that he had made his remark after he noticed both prosecutors had indentations in their foreheads, causing him to wonder if it was a job requirement. Juror No. 10 said his remark was a poor attempt at humor and he denied that had he formed any opinion about the case. The court admonished Juror No. 10 not to discuss the case and not to mention their conversation to the other jurors. The parties and the court agreed the juror did not need to be excused.

21

Juror No. 10's comment may have been ill-advised but it was innocuous and did not indicate Juror No. 10 had prejudged the case or was biased in anyway. No prejudice to defendant was demonstrated. Because the court and both lawyers agreed there was no basis for excusing Juror No. 10, there is no reasonable probability that the trial court would have granted a mistrial motion. Taylor was not ineffective in failing to make a meritless objection. (*People v. Jones* (1998) 17 Cal.4th 279, 309.)

Defendant rather improbably conjectures that, after the exchange with the trial court, Juror No. 10 was "aware that a D.A. spy might be nearby at any time, and the potential effect of this situation on that juror's mind calls into question the subsequent decision making process on the part of that juror." There is no support whatsoever for this speculation.

Defendant also asserts that the prosecutor knew or should have known that placing a "spy" among the jurors could give him the "thin edge they needed to push the second jury towards the prosecution side, an edge gained by juror intimidation." But the advocate was assigned to watch and assist Hernandez, not to eavesdrop. Juror No. 10 was not told that the advocate was the source of the information about his comment. Therefore, he could not have felt intimidated by her. Accordingly, any mistrial motion would have been meritless.

Any motion to dismiss the case under the state double jeopardy clause would also have failed because that clause bars retrial following the grant of a defense mistrial motion in two circumstances not applicable here: "(1) when the prosecution *intentionally* commits misconduct for the purpose of triggering a mistrial, and also (2) when the

22

prosecution, believing in view of events that unfold during an ongoing trial that the defendant is likely to secure an acquittal at that trial in the absence of misconduct, *intentionally and knowingly* commits misconduct in order to thwart such an acquittal–and a court, reviewing the circumstances as of the time of the misconduct, determines that from an objective perspective, the prosecutor's misconduct in fact deprived the defendant of a reasonable prospect of an acquittal." (*People v. Batts* (2003) 30 Cal.4th 660, 695, italics added.) Thus, this basis for defendant's IAC claim, like the other grounds, fails.

IV

REMAND TO IMPOSE OR STRIKE THE SECTION 451.1, SUBDIVISION (A)(5)

ENHANCEMENT

During sentencing, the trial court twice mentioned staying the section 451.1, subdivision (a)(5), enhancement, but the trial court did not stay, strike or impose sentence on it.

Section 451.1, subdivision (a), provides: "Notwithstanding any other law, any person who is convicted of a felony violation of Section 451 shall be punished by a three-, four-, or five-year enhancement if one or more of the following circumstances is found true . . . ." A trial court has authority under section 1385 to strike a section 451.1 enhancement. (*People v. Wilson* (2002) 95 Cal.App.4th 198, 203.) Thus, a trial court must either impose or strike a section 451.1 enhancement. "'The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction for the first time on appeal.'" (*People v. Flores* (2005) 129 Cal.App.4th 174, 187-188, quoting *People v. Bradley* (1998) 64 Cal.App.4th 386, 391; *People v. Scott* (1994) 9 Cal.4th 331,

23

354.)  Accordingly, we remand the case to allow the court an opportunity to impose a term on the enhancement or strike it "in the furtherance of justice . . . ."  (§ 1385, subd. (c)(1).)

V

DISPOSITION

We remand for the limited purpose of allowing the trial court to exercise its discretion to impose or strike the section 451.1, subdivision (a)(5) enhancement in count 1.  Otherwise we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

24