Filed 9/12/13  P. v. Perez CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TITO PEREZ, JR.,<br><br>    Defendant and Appellant. | E055082<br><br>(Super.Ct.No. FSB905298)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Ronald M. Christianson, Judge.  Affirmed.

David L. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel, Deputy Attorney General, for Plaintiff and Respondent.

1

Defendant Tito Perez, Jr., appeals his conviction for the gang-related first degree murder of Alex Alaniz. The sole issue he raises is ineffective assistance of trial counsel, who, defendant contends, prejudicially failed to investigate possible exculpatory evidence and failed to call a gang expert to testify on defendant's behalf.

We conclude that even if trial counsel's performance fell below the applicable standard of professional conduct, no prejudice resulted.

<u>PROCEDURAL HISTORY</u>

Defendant was charged with one count of first degree murder, along with gun use and gang allegations. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d), 186.22, subd. (b)(1)(C).)[1] A jury convicted him of the offense as charged and found true allegations that he personally discharged a handgun, resulting in death (§ 12022.53, subd. (d)), and that he committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

Defendant filed a motion for a new trial, asserting ineffective assistance of trial counsel and the erroneous admission of prejudicial evidence. After a hearing, the court denied the motion. The court then sentenced defendant to two consecutive terms of 25 years to life, with a minimum parole eligibility period of 15 years, pursuant to section 186.22, subdivision (b)(1)(C).

Defendant filed a timely notice of appeal.

---

[1] All statutory citations refer to the Penal Code unless another code is specified.

FACTS

On December 12, 2009, a number of people congregated at a house in Colton, occupied by Jane Doe 3, her sister Jane Doe 2, and Doe 3's children. The sisters socialized with members of Eastside Colton as well as with members of Northside Colton. The people at the house that night included members of both gangs. The two gangs were sometimes at odds and sometimes on friendly terms.

In September 2009, Daniel Rivera, an Eastside Colton member known as "Clumsy," was murdered. Colton police believed that a Northside Colton member named Michael Montes, or "Red," had killed Rivera, but as of the date of defendant's trial, Montes had not yet been charged with Rivera's murder. Defendant was known to Colton police as a member of Eastside. He used the moniker "Stomps" or "Stomper." There was a tribute area in the living room of Doe 3's house, commemorating Rivera. The tribute area had a photograph of Rivera, a photograph of defendant, and photograph of defendant standing with Doe 3. The people depicted in the photographs were throwing gang signs. Photos of defendant and others throwing Eastside gang signs were also found on defendant's cell phone after his arrest, as were photographs of a memorial for Rivera and of Rivera's gravesite.

On the night of December 12, 2009, defendant was at Doe 3's house. Doe 3 had known him for about two months. She knew him as "Tito" or "Stomps." Doe 2 also knew defendant and saw him at the house that night. Alex Alaniz, a Northsider known as "Crooks," arrived at the house around 4:30 a.m. Doe 3 had met him only one time before. Earlier in the evening, a Northsider called "Bala" had introduced himself to

3

defendant in a rude way. Doe 3 didn't want trouble, so she asked Bala to leave. Bala said he was going to return with Crooks and Smokey.

Jane Doe 1, who was affiliated with Northside Colton, drove Alaniz and a Northsider called "Risky" to Doe 3's house. Shortly after Alaniz entered the house, defendant asked Alaniz to go outside with him. Defendant apparently felt disrespected about something, and he wanted to go outside and "make sure everything was square." Frankie Fernandez, a Northsider known as "Frankie Boy," also stated that there was tension between Alaniz and defendant, whom he identified as "Tito."[2] Doe 3 saw them walk out the door and almost immediately heard gunshots. She ran outside and saw Alaniz on the ground. Alaniz said "Tito" shot him.[3] Doe 1 called 911.

Alaniz died of a gunshot wound to the chest. Empty nine millimeter shell casings and one live nine millimeter bullet were found in the vicinity of Alaniz's body. No weapon was ever found. However, Doe 1 heard a sound consistent with racking a semiautomatic pistol just as defendant and Alaniz walked out the door, and the bullets were consistent with ammunition used in semiautomatic pistols. Defendant's cell phone contained a photograph of him holding a semiautomatic pistol.

---

[2] At trial, Doe 3 denied hearing this conversation. Colton police detective Wilson testified that Doe 3 described the conversation to him when he interviewed her after the shooting. Wilson also related what Fernandez had told him during their interview. Fernandez was completely uncooperative when he testified at trial, and his testimony was inconsistent with what he had told Wilson. A video of Fernandez's interview was played for the jury.

[3] Doe 3 gave multiple accounts of what Alaniz said, both in her interview with Detective Wilson and at trial. Among other versions, she stated that she did not hear what Alaniz said but that Frankie Boy told her that Alaniz said defendant shot him.

LEGAL ANALYSIS

DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL

COUNSEL WAS NOT VIOLATED

A criminal defendant has a constitutional right to the effective assistance of trial counsel. In order to establish a claim of ineffective assistance of counsel, or IAC, the defendant has the burden of demonstrating that his trial attorney failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate. The defendant must also show that it is reasonably probable that the outcome of the trial would have been more favorable in the absence of his attorney's failings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-694.)

We first address the standard of review. The claim of IAC was first asserted in defendant's motion for a new trial. The Attorney General asserts that because a trial court's denial of a motion for new trial is reviewed on appeal for abuse of discretion, abuse of discretion is an appropriate standard for review of defendant's IAC claim. The case she relies on, however, is a People's appeal from an order *granting* a new trial on grounds of ineffective assistance of trial counsel. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 201.) In *People v. Ault* (2004) 33 Cal.4th 1250 (*Ault*), the California Supreme Court held that while abuse of discretion is the standard of review for an order granting a new trial motion, different considerations may apply to appellate review of an issue which was unsuccessfully raised in a new trial motion. The court noted that there are two lines of authority, some applying abuse of discretion to orders denying new trial motions, and others applying de novo review. (*Id.* at pp. 1260-1263.) The court

5

discussed the reasoning underlying the latter: First, unlike an order granting a new trial, an order denying a new trial finally disposes of a party's rights. (*Id*. at p. 1261.) Second, the order denying a new trial is not independently appealable. Because the denial may be reviewed only on appeal from the final judgment, article VI, section 13 of the California Constitution obliges the appellate court to conduct an independent examination of the record to determine whether a miscarriage of justice occurred. (*Id*. at pp. 1261-1262.) "As in any appeal from a final judgment, the reviewing court must determine for itself whether errors denied a fair trial to the party against whom the judgment was entered." (*Id*. at p. 1262.) Finally, it would be anomalous "to apply more deferential review to a claimed error affecting the fairness of the judgment simply because the complaining party moved unsuccessfully for a new trial on the same ground in the court below." (*Ibid*.)

The court did not resolve the split of authority concerning orders denying new trial motion; the issue in *Ault* was the scope of the trial court's discretion in granting a new trial. (*Ault*, *supra*, 33 Cal.4th at p. 1255.) Accordingly, the court's discussion of the standard applicable to denial of new trial motions is dictum. In *People v Nesler* (1997) 16 Cal.4th 561 (*Nesler*), however, a plurality of the court held that when a criminal defendant appeals the denial of his or her new trial motion based on juror misconduct, the appellate court must independently review the trial court's conclusion that no prejudice arose from the misconduct as a mixed question of law and fact. (*Id*. at p. 582 & fn. 5.) Taken together, *Ault* and *Nesler* are persuasive authority that we must review the denial of defendant's new trial motion independently as a question of mixed law and fact, just as we would if the IAC claim was not first raised in a motion for new trial. Although we

6

give deference to the trial court's factual findings, if any, if they are supported by substantial evidence, both the performance and prejudice prongs of IAC are mixed questions of law and fact which are predominantly legal. Accordingly, we review them independently. (*In re Alcox* (2006) 137 Cal.App.4th 657, 666; *People v. Mickey* (1991) 54 Cal.3d 612, 649; *Strickland v. Washington*, *supra*, 466 U.S. at p. 698.) Here, it is undisputed that trial counsel conducted at most a limited investigation into the areas defendant asserts on appeal as the basis for his IAC claim. Accordingly, we will address only whether his conduct fell below the applicable standard of performance and whether any act or omission was prejudicial. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-688, 691-694.)

*Failure to Investigate/Call Angel Enriquez as an Alibi Witness*

In his new trial motion, defendant asserted that Angel Enriquez could have testified that defendant's head was not shaved at the time of the murder. This could have been sufficient to raise a reasonable doubt that defendant was the killer, he asserted, because all of the witnesses described the killer as bald.[4] On appeal, defendant asserts that his trial attorney's performance was deficient because he failed to interview Enriquez and was therefore unable to establish that defendant's head was not shaved the night of the homicide.

---

[4] The moving papers do not cite any testimony in the trial transcript to support the claim that "all" of the witnesses testified that the killer was bald.

Even if counsel should have interviewed Enriquez as part of his trial preparation, his failure to do so was not prejudicial. First, it is not the case that multiple witnesses described the shooter as bald. On the contrary, only Doe 1 described the person who apparently shot Alaniz as bald, and as we discuss below, her ultimate identification of defendant did not rest on the question of baldness. Neither Doe 2 nor Doe 3 described the shooter as bald. Frankie Fernandez described seeing a bald person present at the house, but he did not see who went out the door with Alaniz and did not see who shot Alaniz. Accordingly, he did not describe the shooter as bald. He also said that the "bald one" was still at the house after the shooting.

Second, the witnesses who identified defendant did so on the basis of their prior knowledge of him. Doe 1 told Detective Wilson that she saw a bald man with a gun in his hand walk out of the house behind Alaniz shortly before she heard the shots. She claimed not to know who it was, but during a break in the interview, Detective Wilson overheard her telling a friend on the phone that she knew who it was, that she didn't know his name but that she would know him if she saw him. After the interview resumed, she identified defendant's photograph in a photo lineup as one of two people who might have been the man with the gun. She also identified defendant at trial as the man who walked past her with a gun shortly before the shooting occurred.

Similarly, Doe 3's identification of defendant as the person who left the house with Alaniz seconds before the shots were fired was based on her acquaintance with defendant, not on whether he had hair that night. Finally, Frankie Fernandez told Detective Wilson that there was tension between "Tito" and Alaniz that night. He, Doe 1

8

and Doe 3 all identified defendant's photograph in a photo lineup as the person they were talking about.

Because baldness was not a factor in identifying who shot Alaniz, there is no reasonable probability that Enriquez's testimony would have altered the outcome of the trial in defendant's favor. Accordingly, defendant has failed to meet his burden of demonstrating that his attorney's failure to interview Enriquez was prejudicial. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 691, 693-694.)

*Gang Allegations/Motive Evidence and Third-Party Culpability.*

Defendant also contends his trial attorney failed to provide competent representation because he "fail[ed] to attack the State's gang expert and the prosecution's notion that this homicide was a gang retaliation" and failed to present evidence that Paul Bustamante, aka Risky, might have been the shooter.

He first contends that if trial counsel had investigated the prosecution's theory that defendant killed Alaniz in retaliation for the murder of his friend Clumsy by "Red" Montes, counsel would have learned that defendant and Montes were friends and bore each other no animosity. Trial counsel conceded that he did not follow up when defendant informed him, immediately before closing arguments, that he and Montes were friends.[5] However, he testified that he believed he must have discussed the retaliation theory with defendant before and during the trial, and that defendant had never previously

---

[5] Defendant's new trial motion included two letters purporting to be from Montes which indicated that he and Montes had a friendly relationship. Trial counsel did not have the letters during the trial. Defendant did not explain why he did not give those letters to his trial attorney, and the letters were never authenticated.

9

mentioned that he and Montes were friends. In any event, he did not believe that he would have pursued that angle because it would have connected defendant to the "gang life," and he had done everything he could to minimize defendant's gang involvement.

We cannot say that it was an unreasonable tactical decision to attempt to portray defendant as being only peripherally involved in Eastside Colton, in light of the prosecution's retaliation theory.[6] Moreover, defendant's alleged friendship with Montes may explain why defendant did not kill Montes to retaliate for Clumsy's murder, but it has no relevance to whether defendant killed Alaniz, a Northsider, to retaliate against Northside Colton for the killing of his friend. Because it is not reasonably probable that Montes's testimony would have altered the outcome in defendant's favor, any failure by trial counsel to investigate Montes as a possible defense witness was not prejudicial. Moreover, the parties stipulated that Montes's attorney had said that Montes would assert his Fifth Amendment privilege if he were called to testify. Trial counsel had testified that he would have expected that result if he had called Montes to testify about his friendship with defendant. Accordingly, counsel's failure to investigate was not prejudicial for this reason as well.

Defendant next asserts that trial counsel should have investigated a fight which took place the day before the killing at a bar called Linko's. In the new trial motion, defendant asserted that Alaniz was involved in that fight and that Paul Bustamonte, aka

---

[6] Defendant criticizes trial counsel for "permitting" Detective McFarland to testify that the killing might have been in retaliation for Clumsy's murder but does not assert that McFarland's testimony was inadmissible.

10

"Risky," was involved as well. Bustamonte was at Doe 3's house the night of the murder. Defendant contended that trial counsel should have investigated Bustamante's involvement because it would give Bustamante a motive for killing Alaniz.

Trial counsel was aware that the fight took place but did not investigate further once he was told by the police that there was no security camera video of the fight. However, he explained that he chose not to pursue a third-party culpability theory because several people at the house who knew defendant said that defendant shot Alaniz or said that they saw him walk out of the house with a gun. Again, we cannot say that this was an unreasonable tactical choice. Doe 1 and Does 3's testimony and/or statements to police were compelling evidence that defendant shot Alaniz, and Bustamante's involvement in a fight with Alaniz would do little to cast doubt on their testimony. Moreover, defendant did not provide any evidence that Bustamante *was* involved in the fight. The motion states that the "defense is informed and believes that there was evidence obtained by the investigating agency of a fight that occurred hours before the murder between" Alaniz and Bustamante, but defendant did not introduce any evidence at the hearing to support that assertion. It is arguable that trial counsel should have investigated the possibility that Bustamante had a motive to kill Alaniz, but his failure to do so cannot be found to be prejudicial unless there is some reason to believe that the investigation would have turned up admissible exculpatory evidence.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P.J.

We concur:

RICHLI

J.

MILLER

J.

12