Filed 3/23/21  P. v. Harris CA2/5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. TREVEON DESHAWN HARRIS, Defendant and Appellant. | B299405 (Los Angeles County Super. Ct. No. YA095119) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Treveon Deshawn Harris (defendant) of the premeditated murder of Alex Anene (Alex).  Defendant moved for a new trial, arguing ineffective assistance of counsel (he believed his lawyer should have called a crime scene reconstruction expert to testify) and newly discovered evidence (opinion testimony as summarized in a post-trial report prepared by that same expert).  The trial court denied the new trial motion and the only issue we are asked to decide is whether that was reversible error.

## I.  BACKGROUND

Alex lived in an apartment with his elderly mother Monica Anene (Monica).  Monica went to bed around midnight on April 20, 2016, and Alex stayed up to finish doing his laundry and packing for an early morning flight to Nigeria.

Not long after Monica fell asleep, she awoke to the sound of gunfire; three shots, a pause, then six more shots.  Monica got out of bed and did not see Alex in the apartment.  She was not initially worried, but after a while, she became concerned and unsuccessfully tried to reach him on his cell phone.  Police activity at the apartment building ensued, and officers soon came to Monica's door and told her Alex had been shot and killed in the building's laundry room, which also housed the apartment building's mailboxes.

The laundry room is on the apartment building's lowest level.  It is a narrow, roughly rectangular space running from west to east (approximately 18 feet long) and divided into two distinct areas: a hallway in the western portion (approximately 12 feet long and four feet wide) with two rows of tenant mailboxes along one wall, and an alcove in the eastern portion with two

washers and one dryer.  Alex's body was found in the hallway with his head and torso under the mailboxes and his legs angled toward the north wall.  A trail of blood led away from the laundry room, through the apartment building's garage, up the driveway, and out onto the street.

Police investigation of Alex's killing turned up witnesses and physical evidence incriminating defendant.  One of Alex's neighbors lived with defendant's ex-girlfriend in an apartment over the laundry room.  On the night in question, defendant knocked on the neighbor's door looking for his ex-girlfriend.  After the neighbor told defendant his ex-girlfriend was not there, he "instantly got attitude" and became "upset" and "agitated."  A short time after the neighbor closed her apartment door ("a couple of seconds to a couple of minutes" later) the neighbor heard at least five gunshots.  In addition, when the authorities processed evidence recovered at the crime scene, they found defendant's DNA in two samples of blood found inside the laundry room and on pieces of a broken metal bracelet defendant was known to wear that was found on the floor of the laundry room.  The police also performed DNA testing on the blood trail leading away from the scene of the crime; it too was a probabilistic match to defendant.

Later police investigation revealed defendant sought medical treatment for a gunshot wound just 15 minutes after he knocked on the neighbor's door at the apartment building where Alex lived.  At approximately 2:00 a.m. on the night in question, defendant went to a nearby hospital with a gunshot wound to his left arm, but he left without receiving treatment.  Later that morning, however, defendant sought and received treatment for

3

his injury at another hospital.  Defendant did not contact the authorities to report he had been shot.

Police obtained a warrant to search defendant's residence and recovered a partially full box of .40 caliber ammunition.  The caliber of these bullets matched the caliber of nine expended cartridges and bullet fragments found by the police in the laundry room where Alex was killed.  A forensic examination of the expended cartridges recovered from the murder scene determined they were all fired from the same weapon.

The police arrested defendant and the Los Angeles County District Attorney charged him with murdering Alex.  At trial, in addition to presenting the aforementioned physical evidence and witness testimony, the prosecution introduced call records and text messages recovered from defendant's cell phone (even though defendant attempted to delete the messages).  Beginning the afternoon before the murder, defendant called his ex-girlfriend several times but she did not answer.  In response, he texted her: "You answer your mother fucking phone when I call."[1]  A few hours later, he tried calling her again, and again she did not answer; he then sent another text message:  "Don't I answer when you call?"[2]  When she sent him a text reply a few minutes later, he responded with another message:  "Acknowledge me then.  Let me know something bitch.  If something happened to

---

[1]     As read to the jury by the prosecutor.  The actual text message was as follows:  "U ANSWER YO M.F. FONE WEN I CALK."

[2]     As read to the jury by the prosecutor.  The actual text message was as follows:  "DON'T I ANSWER WEN U CALL?"

4

you out here, you know imma go crazy."[3]  After that, in the three hours that preceded defendant's appearance at the neighbor's apartment door, defendant texted his ex-girlfriend once and called her seven times without receiving a response.

The prosecution also presented autopsy-related testimony and testimony from a firearms criminalist who examined the crime scene.  A medical examiner testified Alex was shot six times: once in the right thigh, twice in the left thigh, once in the right hand, and twice in the head (these two were the fatal shots).  The firearms criminalist testified Alex was shot in the head while lying on the floor underneath the tenants' mailboxes. The criminalist opined all of the shots were fired in a downward direction from west to east, that is, from the area near the entrance to the laundry room toward the alcove where the two washers and dryer were located.

Defendant did not put on a defense case at trial.  But defendant's attorney did successfully offer exhibits into evidence during the prosecution's case, including a video of the path from the neighbor's apartment down the stairs to the laundry room and some of defendant's medical records.

During closing argument, the prosecutor theorized defendant arrived at the neighbor's apartment "enraged" by his ex-girlfriend's failure to answer his calls in the hours immediately preceding the murder and then, finding her not at home, killed Alex in an execution-style murder.  Relying on the

---

[3]      As read to the jury by the prosecutor.  The actual text message was as follows:  "ECNOLAGE ME THEN[.]  LET ME KNO SUMTHIN[,] BITCH[.]  IF SUMTHIN HAPPEN TOO U OUT HERE[,] U KNO I'MA GKO CRAZY."

physical evidence, the prosecutor contended Alex must have snatched at defendant's left hand, which caused defendant's bracelet to break, caused defendant to shoot himself in the left arm, and resulted in the gunshot to Alex's right hand. The prosecution dismissed the defense's apparent theory—that there must have been another, unidentified shooter who killed Alex— because in the confined space of the laundry room it would have been difficult if not impossible for a third-party shooter standing near the entrance and firing toward the alcove to shoot around defendant and hit Alex.

As anticipated, the defense argued there was another shooter who intended to kill defendant, succeeded in shooting him in the arm, and unintentionally shot and killed Alex. To support this theory, defendant's trial attorney directed the jury's attention to medical testimony and records regarding the absence of any soot or stippling marks around defendant's gunshot wound, which, in counsel's view, meant the shot must have been fired from some distance away and could not have been self-inflicted. Defendant's attorney also argued defendant's bracelet was not torn from his wrist by Alex but shot off by the unidentified third-party shooter.

After less than an hour of deliberation, the jury found defendant guilty of first degree murder. The jury also found true an associated personal use of a firearm enhancement (Pen. Code,[4] § 12022.53, subd. (d)).

Before sentencing, defendant retained new counsel and filed a motion for a new trial that is the focus of this appeal. The

---

[4] Undesignated statutory references that follow are to the Penal Code.

new trial motion chiefly argued defendant's former attorney (who we will call the trial attorney) provided constitutionally ineffective assistance in failing to call Bryan Burnett (Burnett), a previously appointed expert for the defense who purportedly had "conclusive evidence" of defendant's innocence. Attached as an exhibit to the motion was a 23-page report Burnett prepared after the jury's guilty verdict.

The trial court held an evidentiary hearing on the new trial motion; defendant's trial attorney and Burnett both testified. Defendant's trial attorney had received, at the time of trial, a shorter seven-page report from Burnett opining defendant's bracelet was likely shot off defendant's wrist. Trial counsel testified he ultimately decided not to call Burnett because, on balance, he thought he was a "loose cannon" whose testimony would hinder, not help, the defense.

Among other things that gave him pause, defendant's trial attorney found Burnett's belief that there were two guns involved in the crime problematic. Trial counsel testified he tried to explain to Mr. Burnett "repeatedly" that the presence of a second gun would not help—and would actually hurt—defendant's case because there was no physical evidence supporting such a theory (such as expended cartridges or bullets from a gun other than a .40 caliber Smith and Wesson firearm) and because the jury would likely conclude any second gun (in addition to a gun used by the assumed third-party shooter) would have been in defendant's hand, not Alex's. Defendant's trial attorney also consulted with another crime scene reconstructionist who disagreed with Burnett's findings, and this reinforced the attorney's view that it would be unwise to call Burnett to have him testify to his "second gun" theory. Defendant's trial attorney

also considered the favorable testimony he had been able to elicit from the prosecution's experts.  The deciding factor for defendant's trial attorney in deciding not to call Burnett, however, was the revelation that he had been professionally disciplined.[5]  Defendant's trial attorney consulted with a supervisor in his office and the supervisor concurred with his decision not to put Burnett on the witness stand.

When it was Burnett's turn to testify during the new trial motion hearing, he opined his findings about the bracelet in his shorter, first report provided to defendant's trial attorney were exculpatory because they refuted the prosecution's theory that Alex pulled the bracelet from defendant's wrist and, derivatively, the theory that there had been a struggle between Alex and defendant.  Burnett also testified his second, longer report completed after trial was also exculpatory because it showed defendant "was a victim, not an assailant," who happened to be "in the wrong place at the wrong time."

Among other things, Burnett opined Alex was shot in the legs by a third party outside of the laundry room because the leg wounds were "through and through" and there were no corresponding defects in the walls of the room from bullet strikes. Burnett testified the evidence supporting his opinion—prior bleeding by Alex and bullet strikes on the floor of the laundry room—was likely obscured by the massive blood pool near Alex's

---

[5]     Although it had been explained to him at the time, defendant's trial attorney could not recall the exact nature of the professional discipline suffered by Burnett.  During his direct examination, Burnett denied his accreditation had been taken away.

body.  Under questioning from the trial court, however, Burnett conceded his opinion about the blood pool concealing theory was rendered without any scientific basis.

Burnett further opined defendant was not Alex's murderer due to the nature of defendant's arm wound, which he characterized as a hit from a ricocheting bullet.  Under questioning from the trial court and defendant's new attorney, Burnett acknowledged he was not a pathologist and conceded that his opinion about how an unjacketed bullet travels inside a human body was based primarily on his "case experience" (prior to opening his consulting business, he had worked for five years as a trainee in a private crime lab).

The trial court denied the motion for a new trial.  The court found trial counsel made a reasonable decision not to call Burnett after making a "detailed" assessment of the value of his testimony and in light of the fact the prosecution had essentially conceded at trial it was possible the bracelet had been shot off rather than pulled off by Alex, which meant the information was before the jury even without Burnett's testimony.  As for defendant's new evidence argument, i.e., the opinions expressed in the longer report Burnett produced post-trial, the court found the report based on "pure[ ] speculation" and, as such, insufficient to warrant a new trial.

The trial court sentenced defendant to 50 years to life in state prison and this appeal ensued.

## II.  DISCUSSION

As we will go on to explain at greater length, the trial court correctly denied defendant's new trial motion.  Defendant's trial attorney made a reasonable—we could even say wise—tactical

9

decision not to call Burnett after considering his background and proposed testimony and concluding he would not help (and might even hurt) defendant's case. The so-called new evidence in Burnett's post-trial report, for some of the same reasons, also does not suffice to establish the trial court abused its discretion in denying defendant's motion for new trial.

### A. Defendant's Trial Counsel Was Not Constitutionally Ineffective

A trial court has "authority to grant a new trial on the ground of inadequate representation of counsel," even though it is not one of the enumerated grounds in the statutory provision (§ 1181) for ordering a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 577-578; *People v. Callahan* (2004) 124 Cal.App.4th 198, 209.)

"'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' [Citations.]" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

In determining whether counsel's performance was deficient, we consider whether "'"counsel's representation fell below an objective standard of reasonableness under prevailing professional norms."'" (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) We "'defer[ ] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) Decisions about what witnesses to call are

"matters of trial tactics and strategy which a reviewing court generally may not second guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059; accord, *People v. Bolin* (1998) 18 Cal.4th 297, 334 [deciding whether to call certain witnesses is a matter of trial tactics, unless that decision results from an unreasonable failure to investigate].)

The trial court correctly concluded there was no performance falling below prevailing professional norms here. Defendant's trial attorney evaluated the value of Burnett's testimony to the defense in light of several factors including favorable testimony regarding defendant's bracelet that was obtained from the prosecution's witnesses, Burnett's persistence in promoting a theory that counsel found unsupported and unhelpful, and the professional discipline Burnett suffered, which would undermine the persuasiveness of his opinions. These considerations alone provide a sound basis for making a reasonable tactical decision to forgo calling an expert witness. But counsel did more and consulted with (1) another defense expert who faulted Burnett's findings and (2) another, more senior attorney who concurred with the decision not to call Burnett to testify. On this record, it is not even close: defendant's trial attorney made a reasonable tactical decision that we will not second guess. (*People v. Mitcham*, *supra*, 1 Cal.4th at 1059.)

> B.    *The Trial Court Correctly Concluded Burnett's Post-Trial Expert Report Was Not Newly Discovered Evidence Warranting Retrial*

A new trial should be granted based on newly discovered evidence only if the evidence is "material to the defendant" and the defendant "could not, with reasonable diligence, have

11

discovered and produced [the evidence] at the trial." (§ 1181, subd. (8).)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "'[T]he trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' [Citation.]" (*Id.* at 329.) Our review is for abuse of discretion. (*Id.* at 328.)

Three of the aforementioned factors establish there was no abuse of discretion in denying defendant's new trial motion. The evidence, i.e., Burnett's opinions in his longer post-trial report, could have been discovered and produced at trial: Burnett was the defense's appointed expert, he consulted at significant length with defense counsel before trial, and all of his opinions expressed in his post-trial report concerned physical evidence available at the time of trial. The purported newly discovered evidence was also largely cumulative because the defense was able to argue at trial—relying on points developed during the prosecution's case—that the bracelet was shot off defendant's arm (not pulled off during a struggle with Alex). And the claimed newly discovered evidence was not so significant as to make a different result probable on a retrial. Burnett's conclusions were

12

informed by speculation and analysis outside his core area of expertise, the jury likely would have discounted his opinions anyway when it learned of the professional discipline he suffered, and the import of his conclusions paled in comparison to the other strong evidence in the case: defendant's DNA at the scene, his upset demeanor before the shooting, and the ammunition discovered during the search of his residence that matched the caliber of the ammunition used in the shooting (which was determined to have come from a single firearm).

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.


We concur:



RUBIN, P. J.



KIM, J.